No. 97-698

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 135

294 Mont. 527

983 P.2d 893

STATE OF MONTANA,

Plaintiff and Respondent,

v.

DALE RENEE,

Defendant and Appellant.

APPEAL FROM: District Court of the Thirteenth Judicial District,

In and for the County of Yellowstone,

The Honorable Diane G. Barz, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

L. Sanford Selvey, II, Chief Public Defender;

Carrie L. Garber, Deputy Public Defender, Billings, Montana

For Respondent:

Hon. Joseph P. Mazurek, Attorney General;

Cregg W. Coughlin, Assistant Attorney General, Helena, Montana

Dennis Paxinos, Yellowstone County Attorney, Billings, Montana

Submitted on Briefs: January 28, 1999

Decided: June 14, 1999

Filed:

_____

Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

**¶1. Dale Renee (Renee) appeals from the sentence imposed by the Thirteenth Judicial District Court, Yellowstone County, pursuant to his plea of guilty to three misdemeanor offenses. We affirm.**

Issues Presented

**¶2. The issues on appeal are restated as follows:**

**¶3. (1.) Did the District Court err by refusing to consider alternatives to imprisonment in sentencing Renee for his misdemeanor offenses?**

**¶4. (2.) Do Montana's sentencing statutes for nonviolent felony offenders unconstitutionally deprive persons convicted of misdemeanor offenses of equal protection and due process of law?**

**¶5. (3.) Are the equal protection and due process rights of misdemeanor offenders violated because they are not entitled to have their sentences reviewed by the Sentence Review Division of this Court?**

Factual and Procedural History

¶6. On January 7, 1997, the State of Montana (the State) charged Renee by Information in Cause No. DC 97-012 in the Thirteenth Judicial District Court with robbery, a felony, in violation of § 45-5-401(1)(a), MCA, and assault, a misdemeanor, in violation of § 45-5-201(1), MCA. The incident giving rise to these charges occurred on or about December 28, 1996. On that date, in the early hours of the morning, the Yellowstone County Sheriff's Office responded to a report of a robbery and aggravated assault against two young males, M.P. and B.P., that occurred at 3248 Seitz Ronan, Laurel, Montana.

¶7. As deputies learned, the two young men had been out "cruising" in the area of Hardee's Restaurant on 24th Street West and Central Avenue in Billings, when they saw a friend in a vehicle with a number of other occupants at the nearby K-Mart parking lot. The two young men told deputies that they had approached the friend just to say "hi," but that the "friend and others in the vehicle took it wrong." A vehicular chase ensued. At one point during the chase, the two young men were passed by the other vehicle and its occupants "held their gang signs and 'flipped them off.' " M.P. and B.P. were followed all the way to B.P.'s residence at 3248 Seitz Ronan.

¶8. Upon arriving home, the two young men fled their vehicle and ran to the door of B.P.'s residence. However, two men from the other vehicle gave chase, caught them, and began to punch the two young men. During this scuffle, one of the assailants-- later identified as Jeffrey Crow--stabbed M.P. below the left breast with a pocket knife. After extricating themselves from the struggle, the two young men again attempted to get back on the front porch and enter B.P.'s residence. At this point, Renee--whom the two young men did not previously know--yelled at them to get down off the porch and approached the young men. Renee grabbed B.P. by the neck and began to choke him. Then, throwing B.P. against the wall of the house, Renee stated to the two young men, "[M]y name's Dale Renee, don't you forget that." At this point, one of Renee's companions grabbed M.P. around the neck.

¶9. Renee then told the young men, "[N]ow what I'm gonna do is I'm gonna tell you to pull out your wallets and I want you to give me all your money." Upon B.P. giving Renee $10, the only money he had on his person, Renee remarked, "[T]hat'll be great because that'll pay for my drinks." However, since M.P. had only a hair brush and some breath mints on his person, Renee grabbed M.P. by the throat and hit him

three or four times in the upper body. B.P. stated that Renee then "clenched up his fist and hit him right in the eye," causing a cut above B.P.'s eye which began to bleed. As B.P. slumped against the wall of the house, Renee again hit him in the ear and then on top of the head. B.P. attempted to escape and Renee gave chase. At this time, B.P.'s father turned on the porch light and banged on the window, causing the three assailants to flee. As he was departing, one of the assailants yelled back at the two young men, "[Y]our life is screwed, the rest of your life is screwed."

¶10. On April 2, 1997, while Renee was released on bond in Cause No. DC 97-012, the State charged Renee by Information in Cause No. DC 97-273 in the Thirteenth Judicial District Court with intimidation, a felony, in violation of § 45-5-203, MCA. This charge was based upon an incident that occurred around midnight on March 23, 1997. On the night in question, Joseph Waters (Waters) and Renee were at a party at a home on Mirco Circle. The two were collecting money for a keg of beer and they approached Blaine Luhman (Luhman) for a contribution. When Luhman refused, Renee grabbed him and threw him off the deck. Renee then picked up Luhman by the neck, slammed his body against a nearby car, and held him against the vehicle while Waters held a knife next to Luhman's face. While Renee held him, Waters cut Luhman twice in the face with the knife.

¶11. Luhman feared for his life and struggled to get away from Renee. A scuffle ensued, and Luhman, freeing one of his hands from Renee's grasp, lunged at Waters in an attempt to get the knife away from his throat and face. As Luhman grabbed at the knife, Waters yanked the knife through Luhman's hand and fingers, severely cutting them. Although Luhman's hand began to bleed profusely, Renee refused to release him. At this point, eyewitnesses told authorities that Renee demanded that Luhman repeat, "It's cool--say everything's cool." Several of the eyewitnesses later stated that they believed that Waters was going to kill Luhman. Upon seeing all of the concerned eyewitnesses, Renee and Waters finally released Luhman. Luhman was then rushed to the hospital and underwent special surgery because ligaments in his hand had been severed by Waters' knife.

¶12. Pursuant to the terms of a subsequent plea agreement, Renee's felony robbery count in Cause No. DC 97-012 was reduced to a misdemeanor theft charge, and Renee's felony assault count in Cause No. DC 97-273 was reduced to a misdemeanor assault charge. Thus, Renee pleaded guilty, on June 25, 1997, to a total of three misdemeanor offenses in the two cases. On September 10, 1997, the District Court

sentenced Renee to six months in the Yellowstone County Detention Facility on each misdemeanor count, the jail terms to run consecutively, for a total incarceration of eighteen months. Subsequently, on September 29, 1997, Renee filed a motion with the District Court asking for reconsideration of his sentence. Renee argued that the court failed to comply with § 46-18-201(11), MCA, which requires that a sentencing court consider alternatives to imprisonment for nonviolent felony offenders, and that § 46-18-903, MCA, which provides the opportunity for sentence review for those incarcerated in the state prison for one year or more, violated Renee's rights to equal protection and due process. The District Court denied Renee's Motion to Reconsider. Renee appeals.

Discussion

¶13. (1.) Did the District Court err by refusing to consider alternatives to imprisonment in sentencing Renee for his misdemeanor offenses?

¶14. The District Court's rejection of Renee's claim that the plain language of Montana's nonviolent felony sentencing statutes requires that a court consider alternatives to imprisonment in sentencing a misdemeanant involves a conclusion of law. We review a district court's conclusion of law as to whether that conclusion is correct. State v. McElderry (1997), 284 Mont. 365, 369, 944 P.2d 230, 232.

¶15. Renee argues that the District Court erred in rejecting his argument that the plain language of §§ 46-18-101(3)(f), 46-18-201(11), and 46-18-225, MCA, requires that a court consider alternatives to imprisonment in sentencing misdemeanor as well as nonviolent felony offenders. In particular, Renee contends that, since his misdemeanor offenses are by statutory definition other than crimes of violence, the mandate of § 46-18-201(11), MCA, to consider sentencing alternatives to imprisonment should have been applied. The State responds by asserting that, while misdemeanor offenses can be "characterized loosely" as offenses other than crimes of violence, the mandatory sentencing requirements of § 46-18-201(11), MCA, are inapplicable because the "language of the statute is unambiguous" and applies only to "felony offenses."

¶16. Section 46-18-201(11), MCA, provides:

In sentencing a nonviolent felony offender, the court shall first consider alternatives to

imprisonment of the offender in the state prison, including placement of the offender in a community corrections facility or program or a prerelease center or prerelease program. In considering alternatives to imprisonment, the court shall examine the sentencing criteria contained in 46-18-225. If the court subsequently sentences the offender to a state prison, the court shall state the reasons why it did not select an alternative to imprisonment, based on the criteria contained in 46-18-225.

Section 46-18-201(11), MCA (emphasis added). As the State suggests, the crux of this issue is whether the statutory term "nonviolent felony offender" encompasses misdemeanor offenders. We conclude that it does not.

**¶17. A nonviolent felony offender is defined as "a person who has entered a plea of guilty to a felony offense other than a crime of violence or who has been convicted of a felony offense other than a crime of violence." Section 46-18-104(3), MCA (emphasis added). Renee points out that "crimes of violence" are, by definition, felony offenses. *See* § 46-18-104(2), MCA. With this simple proposition we do not disagree. However, we do disagree with Renee's extrapolation that a misdemeanor offense, being other than a "crime of violence" as defined by § 46-18-104(2), MCA, therefore compels that a sentencing court apply the requirements of § 46-18-201(11), MCA, in sentencing a misdemeanor offender.**

**¶18. According to the terms of the plea agreement, Renee pleaded guilty to three misdemeanor charges in return for the State reducing his two felony counts--one for robbery and the other for intimidation-- to two misdemeanors. Having pled guilty to "misdemeanor" offenses, it is hard to see how Renee can now claim that he qualifies for mandatory sentencing procedures which are, by plain statutory language, applicable only to "nonviolent felony" offenses. In this case, the District Court justifiably concluded that it was not bound to follow the mandate of § 46-18-201(11), MCA, and consider the ten criteria set forth in § 46-18-225, MCA, because Renee was not, by the very terms of his guilty plea, being sentenced as a "nonviolent felony offender" as that term is defined in § 46-18-104(3), MCA.**

**¶19. "Where the language of the statute is plain, unambiguous, direct, and certain, the statute speaks for itself." State ex rel. Palmer v. Hart (1982), 201 Mont. 526, 530, 655 P.2d 965, 967. We hold that the District Court did not err in concluding that the plain language of § 46-18-104(3), MCA, applies only to defendants who commit a**

<u>particular kind of felony offense</u> (i.e., a nonviolent felony offense) and, therefore, that a misdemeanor offender, like Renee, is not entitled to have a sentencing court consider the mandatory sentencing requirements of §§ 46-18-201(11) and 46-18-225, MCA, which are applicable only to nonviolent felony offenders.

¶20. (2.) Do Montana's sentencing statutes for nonviolent felony offenders unconstitutionally deprive persons convicted of misdemeanor offenses of equal protection and due process of law?

¶21. In the alternative, Renee asserts that, if the nonviolent felony sentencing statutes just discussed do not apply to misdemeanor offenders then they violate his rights to equal protection and due process of law. In reviewing constitutional challenges to legislative enactments, the " 'constitutionality of a legislative enactment is *prima facie* presumed, and every intendment in its favor will be made unless its unconstitutionality appears beyond a reasonable doubt.' " State v. Lorash (1989), 238 Mont. 345, 347, 777 P.2d 884, 886, *quoting* T & W Chevrolet v. Darvial (1982), 196 Mont. 287, 292, 641 P.2d 1368, 1370. Renee, as the party raising the constitutional challenge, bears the weighty burden of proving the alleged infirmity of Montana's sentencing statutes for nonviolent felony offenders beyond a reasonable doubt. *See* City of Helena v. Krautter (1993), 258 Mont. 361, 364, 852 P.2d 636, 638. Because resolution of this issue involves a question of constitutional law, we must determine whether the District Court's interpretation of the law is correct. Matter of S.L.M. (1997), 287 Mont. 23, 32, 951 P.2d 1365, 1370.

¶22. At the outset, it is necessary to address the State's contention that this Court need not reach Renee's due process challenge. The State argues that Renee has failed to articulate any legal basis on appeal for sustaining a due process claim. We agree with the State that Renee's "contentions on appeal focus solely upon an equal protection argument," and that his due process claim therefore "violates the appellate rules on briefing." Rule 23(a)(4), M.R.App.P., provides that an appellate brief "shall contain the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and pages of the record relied on." Rule 23(a)(4), M.R.App.P. On numerous occasions, this Court has emphasized that it will not address an issue raised on appeal for which no supporting authority is cited and no analysis presented. *See, e.g.,* State ex rel. Booth v. Twenty-First Judicial Dist., 1998 MT 344, ¶ 35, 972 P.2d 325, ¶ 35, 55 St. Rep. 1395, ¶ 35; State v. Steffes (1994), 269 Mont. 214, 233, 887 P.2d 1196, 1208. We

hold that, since Renee has failed to offer any supporting authority or analysis to this Court in his appellate brief, we need not address Renee's due process claim on appeal.

¶23. Turning to Renee's equal protection claim, we review equal protection challenges to legislation under one of three different levels of scrutiny. First, where the legislation at issue infringes upon a fundamental right or discriminates against a suspect class, we apply strict scrutiny, the most exacting standard of review; second, where the right in question has its origin in the Montana Constitution, but is not found in the Declaration of Rights, we employ a middle-tier scrutiny; and finally, where the right at issue is neither fundamental nor warrants middle-tiered scrutiny, we review the challenge under a rational basis test. *Matter of S.L.M.*, 287 Mont. at 32, 951 P.2d at 1371.

¶24. Renee claims that, since both misdemeanor and nonviolent felony offenders may be subject to imprisonment, the fundamental right implicated in this case is "physical liberty." In making this claim, Renee posits that the two classes are similarly situated by virtue of the bare fact that both misdemeanor and nonviolent felony offenders face a potential loss of physical liberty. The State responds that the two classes are not similarly situated because legislative classifications for offenders based upon the gravity of an offense do not violate Montana's equal protection guarantee. In so responding, the State cites Matter of Wood (1989), 236 Mont. 118, 768 P.2d 1370, *superseded by statute as recognized in* State v. Butler, 1999 MT 70, ___ P.2d ___, 56 St.Rep. 291, in which this Court, applying the rational basis test to an equal protection challenge, held that legislative classifications based upon the "seriousness of the offense" are rationally related to the legitimate state objectives of deterring more serious crimes and of protecting society from more dangerous offenders. *See Matter of Wood*, 236 Mont. at 127, 768 P.2d at 1376.

¶25. However, our application of the rational basis test in *Matter of Wood* was predicated on the fact that the appellant in that case failed to show that the State's sentencing scheme either infringed upon a fundamental right or discriminated against a suspect class, thus warranting strict scrutiny. *See Matter of Wood*, 236 Mont. at 125, 768 P.2d at 1374-75 (holding that procedural due process is not a fundamental right, nor is age a suspect classification for equal protection purposes). For that reason, this Court has previously distinguished *Matter of Wood* in a case involving a claim similar to Renee's claim. *See Matter of S.L.M.*, 287 Mont. at 37-38,

951 P.2d at 1374 (distinguishing *Matter of Wood* on the ground that the appellants in that case had only challenged the process by which a sentence is imposed, rather than "challenging the actual loss of physical liberty").

¶26. As Renee points out, this Court has held that, "under the Montana Constitution physical liberty is a <u>fundamental right</u>, without which other constitutionally guaranteed rights would have little meaning." Matter of C.H. (1984), 210 Mont. 184, 201, 683 P.2d 931, 940 (emphasis added). Moreover, we have also concluded that, where the classes are similarly situated with respect to punishment for a criminal conviction, physical liberty is a fundamental right requiring strict scrutiny. *See Matter of C.H.*, 210 Mont. at 198-202, 683 P.2d at 938-40; *Matter of S.L.M.*, 287 Mont. at 32-34, 951 P.2d at 1371-72; *see also* People v. Olivas (Cal. 1976), 551 P.2d 375, 381-85. Renee thus urges this Court to apply strict scrutiny to his equal protection challenge, and require that the State demonstrate a compelling interest in treating misdemeanor and nonviolent felony offenders differently.

¶27. However, the first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner. *See Matter of S.L.M.*, 287 Mont. at 32, 951 P.2d at 1371. The basic rule of equal protection is that persons similarly situated with respect to the legitimate purpose of the law must receive like treatment. It has nevertheless long been a staple of American jurisprudence that "[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." Tigner v. Texas (1940), 310 U.S. 141, 147, 60 S.Ct. 879, 882, 84 L.Ed. 1124, 1128.

¶28. We need not determine whether the sentencing statutes for nonviolent felony offenders pass muster under the strict scrutiny standard of equal protection review. Renee's challenge must fail because, as the State correctly asserts, misdemeanor and nonviolent felony offenders are not similarly situated for purposes of equal protection. In this regard, Renee's reliance upon *Matter of S.L.M.* is misplaced. In that case, this Court held that, since physical liberty is a fundamental right under the Montana Constitution, strict scrutiny would be applied; and that, due to the State's failure to demonstrate a compelling state interest in treating juvenile and adult offenders differently, the Extended Jurisdiction Prosecution Act (EJPA) violated the equal protection rights of juvenile offenders by potentially subjecting them to longer periods of incarceration for the same offense than that permitted for adult offenders.

*See Matter of S.L.M.*, 287 Mont. at 32-39, 951 P.2d at 1371-75.

¶29. In *Matter of S.L.M.*, however, the juvenile appellants were able to pass the threshold inquiry of whether the classes involved were similarly situated. The two classes in that case were: (1) juveniles who are sentenced as adults under the EJPA; and (2) adults who are sentenced for committing the same criminal offense as said juveniles. *See Matter of S.L.M.*, 287 Mont. at 32, 951 P.2d at 1371. We concluded in *Matter of S.L.M.* that, "[s]ince both classes are composed of persons who have committed the same act and who are sentenced 'as adults,' the classes are similarly situated for equal protection purposes." *Matter of S.L.M.*, 287 Mont. at 32-33, 951 P.2d at 1371.

¶30. Here, Renee asserts that the two classes are (1) misdemeanor offenders and (2) nonviolent felony offenders. Renee argues that these classes are similarly situated because both misdemeanor and nonviolent felony offenders "are subject to imprisonment by the sentencing court." Renee does not claim, as did the juvenile appellants in *Matter of S.L.M.*, that the two classes of offenders are composed of persons who have committed the same act and are sentenced for the same crime, yet who face groundless dissimilar punishments under the State's sentencing scheme. It is one thing to hold, as we did in *Matter of S.L.M.*, that persons convicted of the <u>same criminal offense</u> cannot be subject to grossly disparate sentences without a compelling state justification. However, it is quite another to hold that persons convicted of <u>different criminal offenses</u>--one a misdemeanor and the other a felony--must be punished equally.

¶31. Indeed, numerous state courts have rightly concluded that persons convicted of different crimes are not similarly situated and, therefore, may be subjected to different penalties without implicating equal protection concerns. *See, e.g.*, People v. Barrera (Cal. Ct. App. 1993), 18 Cal. Rptr. 2d 395; People v. Jacobs (Cal. Ct. App. 1984), 204 Cal. Rptr. 234; People v. Wells (Colo. 1989), 775 P.2d 563; State v. Wright (Conn. 1998), 716 A.2d 870; People v. Eubanks (Ill. App. Ct. 1996), 669 N.E.2d 678; People v. Willis (Ill. App. Ct. 1991), 577 N.E.2d 1215; People v. Bradley (Ill. 1980), 403 N.E.2d 1029. Viewed simply in terms of the differing statutory definitions of misdemeanor and nonviolent felony offenses, a convicted misdemeanor offender is by legislative classification dissimilarly situated from those persons convicted of nonviolent felony offenses.

**¶32. Moreover, as the State points out, misdemeanor and felony offenders are not similarly situated because of differences in the quality and duration of punishment, as well as the long-term effects on an individual's liberty interest brought about by a felony conviction as compared to that for a misdemeanor conviction:**

When a misdemeanant has finished serving his [or her] sentence, he [or she] leaves with neither further obligation nor disability. The conviction for a misdemeanor involves no further loss of civil rights. Not so for the typical felon: he [or she] will generally spend [a period of time following release from prison] in the "constructive" custody of the Department of Corrections and may be reimprisoned were he [or she] to violate the terms of parole.

A felon is uniquely burdened by a diverse collection of statutorily imposed disabilities long after his [or her] release from prison. For example, [a felon] is denied the right to vote during the period of his [or her] parole. Moreover, a felon may not " . . . engage in certain business; must register with local law enforcement authorities if his [or her] offense related to certain sex charges; loses the right to possess arms; and, if he [or she] testifies in court, may be impeached on the basis of his [or her] prior felony conviction . . . ."

In re Valenti (Cal. Ct. App. 1986), 224 Cal. Rptr. 10, 12-13 (citations omitted); *see also* People v. Hibbard (Cal. Ct. App. 1991), 282 Cal. Rptr. 351 (echoing similar observations).

**¶33. We hold that Renee has failed to make the necessary threshold showing that misdemeanor and nonviolent felony offenders are similarly situated. By pleading guilty to misdemeanor offenses in return for the State dropping the felony charges against him, Renee voluntarily took himself out from under the legislative enactments applicable to nonviolent felony offenders, including any sentencing protections attaching to that type of offender. There is no indication that the sentencing statutes for nonviolent felony offenders establish a classification which treats a similarly situated group in disparate ways. All nonviolent felony offenders enjoy the benefits of Montana's sentencing statutes applicable to that classification of offender--such as the consideration of alternatives to incarceration by the sentencing court. Under the equal protection guarantee, a legislative classification that " 'benefits a particular class' " passes constitutional muster " 'so long as the law operates equally upon those within a particular class.' " Gulbrandson v. Carey**

(1995), 272 Mont. 494, 503-04, 901 P.2d 573, 579, *quoting* Hughes v. Judges Retirement Bd. (Mich. 1979), 282 N.W.2d 160, 167.

¶34. Nor has Renee shown that he is treated differently than other misdemeanor offenders. All persons convicted of misdemeanors, like Renee, face the imposition of their sentences without the statutory sentencing procedures applicable to nonviolent felony offenders; by uniformly disallowing misdemeanor offenders the consideration of alternatives to imprisonment at sentencing, Montana law therefore treats all misdemeanor offenders alike. Thus, this case does not present a situation where "the law lays an unequal hand on those who have committed intrinsically the same quality of offense . . . ." Skinner v. Oklahoma (1942), 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655, 1660. Accordingly, there is no equal protection violation. *See* State v. Tadewaldt (1996), 277 Mont. 261, 270, 922 P.2d 463, 468 (noting that there is no equal protection violation where all members of the "same class" are treated alike).

¶35. (3.) Are the equal protection and due process rights of misdemeanor offenders violated because they are not entitled to have their sentences reviewed by the Sentence Review Division of this Court?

¶36. Renee contends that § 46-18-903, MCA, which provides that sentence review is available only to persons incarcerated in the state prison for one year or greater, deprives misdemeanor offenders of equal protection and due process of law. We refuse to entertain Renee's due process claim because, as previously discussed, that claim violates the appellate rules on briefing. *See* Rule 23(a)(4), M.R.App.P. As Renee has failed to cite any supporting authority, facts, or analysis that would sustain such a claim on appeal, we conclude that Renee's due process challenge need not be reached by this Court.

¶37. With respect to Renee's equal protection claim, § 46-18-903, MCA, provides:

Any person sentenced to a term of 1 year or more in the state prison by any court of competent jurisdiction may within 60 days from the date such sentence was imposed . . . file with the clerk of the district court in the county in which judgment was rendered an application for review of the sentence by the review division.

Section 46-18-903(1), MCA.

**¶38. Renee acknowledges that the plain language of § 46-18-903, MCA, and the relevant Rules of the Sentence Review Division apply only to convicted felons facing incarceration in the state prison, not the county jail. Nonetheless, Renee asserts that the blanket rule of § 46-18-903, MCA, prohibiting misdemeanor offenders from receiving sentence review, regardless of equitable circumstances, precludes those offenders "from challenging the inequity of the sentence in front of a neutral forum," thereby depriving a misdemeanant of equal protection. We disagree for the same reason stated earlier, namely, that misdemeanor and felony offenders are not similarly situated for equal protection purposes. We hold, accordingly, that there is no merit to Renee's equal protection challenge.**

**¶39. Affirmed.**

/S/ W. WILLIAM LEAPHART

We concur:

/S/ J. A. TURNAGE

/S/ JAMES C. NELSON

/S/ JIM REGNIER

/S/ KARLA M. GRAY

/S/ WILLIAM E. HUNT, SR.

/S/ TERRY N. TRIEWEILER