Nos. 05-278 and 05-279

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 100

STATE OF MONTANA,

        Plaintiff and Respondent,

   v.

JOHNNIE SHULTS,

        Defendant and Appellant.

APPEAL FROM:    The District Court of the Eighteenth Judicial District,
                      In and For the County Gallatin, Cause Nos. DC-04-78 and DC-2004-132,
                      Honorable Mike Salvagni, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                R. Stan Peeler, Peeler Law Firm, Bozeman, Montana

        For Respondent:

                Honorable Mike McGrath, Attorney General; C. Mark Fowler,
                Assistant Attorney General, Helena, Montana

                Marty Lambert, County Attorney; Todd Whipple, Deputy
                County Attorney, Bozeman, Montana

Submitted on Briefs:  February 14, 2006

Decided:  May 9, 2006

Filed:

_____
                          Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1    This decision stems from two separate appeals consolidated for this Court's review.  In unrelated proceedings, the State charged Johnnie Albert Shults by information with escape (from Gallatin County Detention Center), a felony in violation of § 45-7-306, MCA, and theft, a felony in violation of § 45-6-301, MCA.  During the theft proceeding, the State provided Shults notice of its intention to have him designated a persistent felony offender (PFO).  Shults pled guilty to both charges at separate hearings before the Eighteenth Judicial District Court, Gallatin County.  The court sentenced Shults as a PFO, imposing a fifty-year sentence in Montana State Prison (MSP) to run concurrently with his sentence for escape.  Shults subsequently filed a notice of appeal.  We affirm.

¶2    We restate the issues as follows:

¶3    1.  Did the District Court err in denying Shults's motion to suppress evidence?

¶4    2.  Did the District Court correctly determine that the State provided adequate notice of its intention to seek treatment of Shults as a PFO pursuant to § 46-13-108, MCA?

¶5    3.  Are Montana's PFO statutes unconstitutional on their face and/or as applied to Shults?

¶6    4.  Did the District Court err by sentencing Shults to prison for ten years, rather than imposing an alternative sentence?

## BACKGROUND

¶7 On December 10, 2003, law enforcement received a report that a white minivan had been driving around the rental units at Abba Dabba Storage in Bozeman, Montana, before business hours. The caller stated that he noticed several storage units missing locks after the driver and his female passenger drove from the premises. Deputy Sheriff Ryan Stratman ran the license plate number through dispatch and learned that the white minivan belonged to Shults, who was on probation at the time.

¶8 Deputy Stratman drove to Shults's residence two days later to question Shults as to why his vehicle had been at the storage unit on the morning of December 10, 2003. After Deputy Stratman knocked on the front door and received no answer, he left the premises. The next day, Deputy Stratman returned to Shults's home with Deputy Tom Madsen. As the officers approached Shults's trailer house, a gated property located within a trailer park, Deputy Madsen observed property in the yard that resembled items stolen from storage unit break-ins under investigation. Although Shults maintains that the entry gate had a "No Trespassing" sign, Deputy Stratman testified that he did not see such a notice. The officers knocked on the front door, but received no answer even though Shults was inside the house. The officers then walked to the rear of the house where they observed a pitched tent. Still receiving no answer, Officer Madsen left the premises, while Deputy Stratman stayed, sitting in his vehicle in front of Shults's residence. After a few moments, Shults appeared from his home and approached Deputy Stratman, who told Shults that he was investigating a criminal trespass complaint. Upon

3

request, Shults granted Deputy Stratman permission to search the tent, at which time the officer observed what he believed to be stolen property. Deputy Stratman arrested Shults and read him his Miranda rights. Shults consented to a search of his home, waiving his rights verbally and in writing; the search resulted in law enforcement seizing stolen property.

¶9     Following Shults's arrest for theft, but before the State filed the information, Shults was held in the Gallatin County Detention Center on a petition to revoke in a separate case unrelated to this appeal. With the help of his girlfriend, Shults managed to escape jail, only to be captured by law enforcement several hours later.

¶10     The State first charged Shults with felony escape and then with theft. The court held an omnibus hearing where the attorneys for both sides signed an order in which the State checked a box indicating its intention to seek treatment of Shults as a PFO. At the change of plea hearing on the escape charge, the State filed a notice to seek increased punishment under the PFO statutes, specifying that the alleged prior conviction consisted of issuing a bad check. Shults nonetheless pled guilty, evidently with the court having fully informed Shults that he could be sentenced as a PFO.[1]  Before the change of plea, Shults filed a motion to suppress physical evidence, as well as statements he had made to law enforcement. The court denied the motion and entered oral findings.

---

[1]The transcript from the change of plea hearing is not included in the record before this Court.

4

¶11 Shults was sentenced to fifty years in MSP on the escape charge. The court also sentenced Shults as a PFO on the theft charge, imposing a fifty-year sentence to run concurrently with the escape charge. Shults appeals both sentences.

## DISCUSSION

¶12 **1. Did the District Court err in denying Shults's motion to suppress evidence?**

¶13 A district court's denial of a criminal defendant's motion to suppress is reviewed on appeal to determine whether the court's findings of fact are clearly erroneous, and whether those findings were correctly applied as a matter of law. *State v. Kintli*, 2004 MT 373, ¶ 8, 325 Mont. 53, ¶ 8, 103 P.3d 1056, ¶ 8.

¶14 Law enforcement drove to Shults's property on December 13, 2003, to question Shults as to why his vehicle was at Abba Dabba Storage three days earlier. In an attempt to communicate with Shults, Deputies Stratman and Madsen knocked on Shults's front door, necessarily reaching the door by entering through the run-down wire fence lining the periphery of the property. At this time, Deputy Madsen observed in plain view items on the lawn that resembled reported stolen property. Shults argues that he had an actual expectation of privacy with regard to the items identified by Deputy Madsen because he had posted a "no trespassing" sign on the fence surrounding his home.

¶15 In *State v. Bullock* (1995), 272 Mont. 361, 384, 901 P.2d 61, 75-76, we held that "in Montana a person may have an expectation of privacy in an area of land that is beyond the curtilage which the society of this State is willing to recognize as reasonable,

5

and that where that expectation is evidenced by fencing, 'No Trespassing,' or similar signs, or by some other means which indicates *unmistakably* that entry is not permitted, entry by law enforcement officers requires permission or a warrant." (Emphasis added; citations omitted.) Our statutory law additionally states that the "[p]rivilege to enter or remain upon [another's] land . . . is extended . . . by the failure of the landowner or other authorized person to post notice denying entry onto private land." Section 45-6-201(1), MCA. "This Court's recognition of a legitimate expectation of privacy has been based on various factors, such as the place of the investigation and the control exercised by the person over the property investigated." *State v. Scheetz* (1997), 286 Mont. 41, 48, 950 P.2d 722, 726.

¶16 "A criminal defendant who seeks to suppress evidence has the burden of proving that the search was illegal." *State v. New* (1996), 276 Mont. 529, 537, 917 P.2d 919, 924. In *Bullock*, we concluded that the defendant had a reasonable expectation of privacy because he took numerous precautions to ensure that others would not enter the property without permission. *Bullock*, 272 Mont. at 385, 901 P.2d at 76. The same cannot be said regarding the case at hand. While Shults maintains that his property had a "No Trespassing" sign on the wire fence surrounding it, Deputy Stratman testified that he never saw such a sign. In addition, the State offered photographs indicating that no sign existed. Although the photographs do not clearly show the entirety of the fence, as it is partially obstructed by Shults's van in the image, Shults did not meet his burden in that he failed to offer other photographs showing the alleged "No Trespassing" sign; nor did

6

he offer witness testimony other than his own stating that such a sign existed. We conclude that the District Court correctly determined that Shults had no reasonable expectation of privacy with regard to items in plain view in his yard.

¶17 Shults also argues that the District Court erred in denying his motion to suppress because his consent to the search of his property was not voluntary or freely given. "In order to determine whether consent to a search was given voluntarily, this Court has adopted the same test used by the Supreme Court, which is the 'totality of the circumstances' test." *State v. Wetzel*, 2005 MT 154, ¶ 16, 327 Mont. 413, ¶ 16, 114 P.3d 269, ¶ 16, citing *State v. Rushton* (1994), 264 Mont. 248, 870 P.2d 1361. Shults insists that he was intoxicated at the time he consented to the search, as well as under the misguided impression that, as a probationer, he had to consent. This Court has previously held that a subject's knowledge of a right to refuse consent is only one of the factors to be taken into account and is not determinative of the questions of voluntariness. *Wetzel*, ¶ 19. Here, no evidence supports Shults's assertion that he was intoxicated at the time Deputy Stratman requested his consent to the search. Moreover, the transcription of Deputy Stratman's taped interview with Shults prior to the search shows that Deputy Stratman specifically stated: "[W]hat I'm going to do is ask you for consent to search your trailer, okay? What that means is I'm going to read you this form right here and if you'd like to give us consent to search, that'd be great. If you don't, that's up to you also." Once the people in Shults's home were safely removed, Shults provided oral and

7

written consent to the search. In light of the above, we conclude that the District Court correctly denied Shults's motion to suppress evidence.

¶18    **2. Did the District Court correctly determine that the State provided adequate notice of its intention to seek treatment of Shults as a PFO pursuant to § 46-13-108, MCA?**

¶19    Shults argues that the State failed to provide adequate notice of its intention to seek PFO treatment pursuant to § 46-13-108, MCA, which states in pertinent part:

> (1) Except for good cause shown, if the prosecution seeks treatment of the accused as a persistent felony offender, notice of that fact must be given *at or before the omnibus hearing* pursuant to 46-13-110.
>
> (2) *The notice must specify the alleged prior convictions . . . .*
>
> . . . .
>
> (5) The notice must be filed and sealed until the time of trial or until a plea of guilty or nolo contendere is given by the defendant.

(Emphasis added.)

¶20    The State maintains that it provided Shults adequate notice of its intentions on three separate occasions. First, the State indicated in the March 2004 information that PFO status could apply. Second, the State checked a box in the September 2004 omnibus order indicating its intention "to seek treatment of [Shults] as a persistent felony offender pursuant to § 46-13-108, MCA." And finally, at the change of plea hearing, the State presented a written notice that included the explanatory language specifying the alleged prior conviction (issuing a bad check).

8

¶21    In response, Shults argues that the information merely indicated that the State *might* seek PFO treatment. As for the omnibus order, while Shults acknowledges that the State specified that it would seek PFO status, he argues that this notification failed to satisfy subsection (2) of § 46-13-108, MCA, because it did not "specify the alleged prior convictions." Shults concedes that the State specified the alleged prior conviction at the change of plea hearing, but insists that this notification was too late under subsection (1) of § 46-13-108, MCA, because it was not provided at or before the omnibus hearing.

¶22    "The purpose for providing such notice is to give the defendant an opportunity to file an objection to the criminal record relied upon in the notice and to hold a hearing should there be any such objection." *State v. McQuiston* (1996), 277 Mont. 397, 408, 922 P.2d 519, 526. In *McQuiston*, we concluded that if a defendant received notice of the State's intention to seek PFO status and was not prejudiced by the State's failure to file the notice, we would not overturn the district court's decision to impose a PFO designation. *McQuiston*, 277 Mont. at 409, 922 P.2d at 527. Similarly, we now hold that if a defendant had ample opportunity to object to PFO treatment, including the underlying charge on which the statute is based, and that defendant was not prejudiced by the timing of the filing, we will not overturn a district court's decision to impose a sentence with a PFO designation.

¶23    In this case, Shults learned of the predicate offense when he pled guilty in November 2004 and the court sentenced him in March 2005. This means that Shults had four months to file an objection to the alleged prior offense of issuing a bad check before

9

the court imposed sentence. The record indicates that Shults did not file an objection, despite having adequate time to do so. We hold that the District Court correctly determined that the State provided adequate notice of its intention to seek treatment of Shults as a PFO pursuant to § 46-13-108, MCA.

¶24 **3. Are Montana's PFO statutes unconstitutional on their face and/or as applied to Shults?**

¶25 Shults argues that Montana's PFO statutes, § 46-18-501, MCA, and § 46-18-502, MCA, unconstitutionally violate the double jeopardy, equal protection and cruel and unusual punishment clauses of the United States and Montana Constitutions. In reviewing constitutional challenges to legislative enactments, the constitutionality of a legislative enactment is *prima facie* presumed, and every intendment in its favor will be made unless its unconstitutionality appears beyond a reasonable doubt. Shults, as the party raising the constitutional challenge, bears the weighty burden of proving the alleged infirmity of Montana's PFO statutes. Because resolution of this issue involves a question of constitutional law, we must determine whether the District Court's interpretation of the law is correct. *State v. Renee*, 1999 MT 135, ¶ 21, 294 Mont. 527, ¶ 21, 983 P.2d 893, ¶ 21.

¶26 <u>Double Jeopardy</u>. Shults's double jeopardy argument is without merit, as this Court has previously held that the PFO statutes (authorizing enhanced sentences for recidivists) do not constitute double jeopardy because "[a] sentence as an habitual criminal is not to be viewed as a new jeopardy." *State v. Wardell*, 2005 MT 252, ¶ 19,

10

329 Mont. 9, ¶ 19, 122 P.3d 443, ¶ 19 (citing *State v. Farnsworth* (1989), 240 Mont. 328, 334, 783 P.2d 1365, 1369; *State v. Maldonado* (1978), 176 Mont. 322, 328, 578 P.2d 296, 300; *Gryger v. Burke* (1948), 334 U.S. 728, 732, 68 S.Ct. 1256, 1258, 92 L.Ed. 1683, 1687).

¶27    Equal Protection.   Shults also argues that Montana's PFO statutes violate equal protection requirements of the Fourteenth Amendment to the United States Constitution and Article II, Section 4, of the Montana Constitution.   "[T]he first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner."  *Renee*, ¶ 27.   Therefore, "when addressing an equal protection challenge, this Court must first identify the classes involved and determine whether they are similarly situated.  If the classes at issue are not similarly situated, then the first criteria for proving an equal protection violation is not met and we need look no further."  *Powell v. State Compensation Ins. Fund*, 2000 MT 321, ¶ 22, 302 Mont. 518, ¶ 22, 15 P.3d 877, ¶ 22 (citation omitted).

¶28    In this case, Shults asserts that § 46-18-502, MCA, creates "a class of individuals" consisting of "[d]efendants with less than five years between the current crime and a prior conviction."   He then argues that "two individuals charged with precisely the same crimes, qualifying as persistent felony offenders, may well receive disparate sentences" within the PFO guideline range.   In other words, Shults argues that individuals prosecuted pursuant to the PFO statutes may be treated differently in sentencing.  Shults

11

has not shown, however, that the PFO statutes classify two or more similarly situated groups in an unequal manner. Thus, we need not further address Shults's equal protection argument.

¶29 <u>Cruel and Unusual Punishment</u>. The third and final constitutional argument presented by Shults is that the sentence he received under the PFO statutes amounts to cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution and Article II, Section 22, of the Montana Constitution. Specifically, Shults contends that the court imposed a sentence excessive and disproportionate to the crime of theft, which alone, carries a maximum sentence of ten years. The State responds that Shults's sentence is within the statutory parameters and his equity argument is a matter for the Sentence Review Division.

¶30 "The general rule in Montana is that a sentence within the statutory maximum guidelines does not violate the prohibition against cruel and unusual punishment. We have recognized an exception to this general rule when a sentence is so disproportionate to the crime that it shocks the conscience and outrages the moral sense of the community or of justice." *Wardell*, ¶ 28 (citation omitted).

¶31 In this case, the sentence does not shock the conscience, nor outrage the moral sense of the community or of justice. Shults has an eighteen-year criminal record and has repeatedly failed to conform his behavior to societal norms, despite having been provided numerous opportunities by the criminal justice system. We therefore conclude that Shults's designation as a PFO does not amount to cruel and unusual punishment.

12

¶32 Finally, since Shults's sentence is within statutory parameters, his equity argument is not properly before this Court. *Wardell*, ¶ 29. Although we will not review the equity of Shults's sentence, he is not precluded from petitioning for sentence review. *See* Sentence Rev. Div. R. 7; *Wardell*, ¶ 29.

¶33 **4. Did the District Court err by sentencing Shults to prison for ten years, rather than imposing an alternative sentence?**

¶34 In Montana, criminal sentencing alternatives are strictly a matter of statute. Our standard of review, therefore, includes the question of whether the district court correctly applied the applicable statutes. We review the district court's findings on which its sentence is based to determine whether they are clearly erroneous. *State v. Alden* (1997), 282 Mont. 45, 49, 934 P.2d 210, 213.

¶35 Shults argues that the District Court violated § 46-18-225(1), MCA, which provides that when "sentencing a non-violent felony offender, the sentencing judge shall first consider alternatives to imprisonment of the offender in a state prison, including placement of the offender in a community corrections facility or program, a prerelease center, or a prerelease program." Among other factors, the sentencing court "shall take into account . . . the interests of justice and the needs of public safety," as well as whether "the needs of the offender can be better served in the community or in a facility or program other than a state prison." Section 46-18-225(2)(a) and (b), MCA. "If the judge sentences the offender to a state prison, the judge shall state the reasons why the judge

13

did not select an alternative to imprisonment, based on the criteria contained in subsection (2)." Section 46-18-225(3), MCA.

¶36 We note at the outset that Shults does not argue that the District Court failed to comply with § 46-18-225, MCA; rather, Shults insists that this Court should remand for "further consideration" of alternative punishment because he is a non-violent offender. In support of this statement, Shults asserts that the only physical violence reflected in his criminal history occurred some eighteen years ago when he allegedly committed a sexual assault. Shults also asserts that his eighteen-year criminal history does not indicate that society is in need of protection from physical harm due to his actions because he is clearly a menace to himself more than a threat to society.

¶37 We have previously held that a district court is granted broad discretion to determine the appropriate punishment, as it is in the best position to weigh the evidence, judge the credibility of witnesses, and resolve conflicts in the evidence. *Alden*, 282 Mont. at 51, 934 P.2d at 214. In this case, the District Court provided a ten-page statement explaining its reasons for imposing a sentence of lengthy incarceration in MSP. The judge initially noted that Shults is thirty-five years old with a criminal history spanning eighteen years, during which time he was "given very many opportunities to do something about his life." The court opined that although escape is not statutorily defined as violent, many individuals can be seriously injured and/or killed as a direct consequence. The court went on to state that many victims have suffered from Shults's crimes, including an Anaconda man that Shults tied up after his escape in order to steal

14

the man's car. In the interest of justice, the judge determined that in order to ensure public safety, Shults must be incarcerated in the state prison to thwart any recurrence of his criminal behavior. As for Shults's needs, the court concluded that Shults is an intelligent man who has continually used his skills to try to subvert the system.

¶38 In light of the above, it is clear that the court considered alternatives to imprisonment, as mandated by § 46-18-225, MCA, and explained why it chose to impose incarceration rather than alternative punishment. We therefore hold that the findings on which the court based its sentence were not clearly erroneous and that the court did not err when it sentenced Shults to a term of imprisonment.

¶39 Affirmed.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ KARLA M. GRAY
/S/ PATRICIA COTTER
/S/ JOHN WARNER
/S/ BRIAN MORRIS