DA 09-0418

## IN THE SUPREME COURT OF THE STATE OF MONTANA

### 2010 MT 92

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

LEWIS GALE THORP,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Sixteenth Judicial District,
In and For the County of Custer, Cause No. DC 08-2
Honorable Gary L. Day, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Fred Snodgrass and Scott Hagan, Attorneys at Law, Billings, Montana

      For Appellee:

            Hon. Steve Bullock, Montana Attorney General; Tammy K. Plubell, Assistant Attorney General, Helena, Montana

            Wyatt Glade, Custer County Attorney, Miles City, Montana

                  Submitted on Briefs:  February 10, 2010

                           Decided:  April 28, 2010

Filed:

                 _____
                              Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1 Lewis Gale Thorp (Thorp) appeals the Judgment of the Sixteenth Judicial District Court, Custer County. We affirm.

¶2 We review the following issues on appeal:

¶3 *Did the State's counsel and a State witness impermissibly vouch for the complaining witness?*

¶4 *Did the District Court properly instruct the jury on the definition of without consent in the context of the sexual intercourse without consent charge?*

¶5 *Did the District Court abuse its discretion by denying Thorp's motion for a new trial?*

¶6 *Did the District Court impose a sentence on Thorp that amounted to cruel and unusual punishment?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶7 The State of Montana (State) filed an information on January 24, 2008, charging Thorp with sexual intercourse without consent and incest. The State's affidavit alleged that Thorp had raped M.A., his fifteen year old niece, on January 23, 2006.

¶8 Dawn Thorp, M.A.'s mother, reported the incident to the Miles City Police Department on December 26, 2007. M.A. told Deputy Dave Power of the Custer County Sheriff's Office that Thorp had taken her to Pirogue Island in the Yellowstone River. M.A. related to Deputy Power that Thorp had a hobby of making dream catchers. Thorp had persuaded M.A. to drive him to Pirogue Island so that he could look for sticks to make the dream catchers.

¶9     Thorp and M.A. initially looked for sticks on Pirogue Island.  Soon after arriving, however, Thorp pushed M.A. to the ground.  He removed her pants and underpants, and forcibly penetrated her vagina with his penis.  M.A. ran away after the incident and hid from Thorp for an unknown amount of time.  M.A. eventually returned to the car where Thorp was waiting for a ride back to his house.

¶10    Dawn Thorp applied for an order of protection against Thorp immediately after M.A. had revealed to Deputy Power what had happened on Pirogue Island.  Dawn contacted Deputy Power again a few days later after she had received a phone call from her brother Dean Thorp.  Dean told Dawn that he had received text messages from Thorp regarding the incident with M.A.  Deputy Power contacted Dean and viewed the text messages on Dean's phone.  Deputy Power obtained numerous text messages sent by Thorp.  The text messages contained admissions regarding Thorp having had sexual contact with M.A.

¶11    The State admitted the text messages between Dean and Thorp as exhibits during trial.  Thorp had texted statements to Dean such as "she initiated everything that ever happened.  The only thing I am guilty of is not stopping her. Bad judgment."  Dean responded to Thorp in one message, asking "who was the adult?"  Thorp responded, "all right.  Then I'm guilty.  Well, then I guess there is only one thing left to do and that is time."

¶12    Sara Hucking (Hucking), M.A.'s close friend, testified at trial.  Hucking testified that M.A. did not tell anyone about the incident because she worried that her family would not believe her.  Hucking testified that M.A. had become withdrawn and quiet after the attack.  Hucking was certain something had happened to M.A.  Hucking pressed M.A. until M.A.

3

confided that Thorp had raped her. Hucking testified, however, that the rape had occurred at Dawn's house during the summer of 2006, just two or three days before M.A. had confided in Hucking.

¶13    Hucking testified further that she kept M.A.'s secret until December 2007, when she decided to tell Mary Battin (Battin). Battin was a long-time friend of Dawn Thorp. Battin asked Hucking about M.A.'s odd behavior. Hucking told Battin that Thorp had raped M.A. Battin, in turn, informed Dawn that she needed to talk to M.A. because Thorp had done something to M.A. M.A. told Dawn of the attack. Dawn immediately took M.A. to report the incident to law enforcement.

¶14    Deputy Power testified regarding his interview of M.A. and his subsequent investigation. The State asked Deputy Power "what was your reaction to hearing this news [the alleged rape] from M.A.?" Deputy Power responded, "my reaction?" The State proceeded, "your reaction as an investigator?" Deputy Power then answered, "it seemed credible."

¶15    Thorp's trial counsel did not object or move to strike Deputy Power's answer. Thorp's trial counsel later told the court outside the presence of the jury that he believed Deputy Power's testimony had amounted to vouching for the credibility of M.A. Thorp's counsel claimed that he had made a strategic decision not to object to Deputy Power's statement because he had not wanted to "draw attention to it."

¶16    Nineteen year-old Jordana England also testified at trial. Jordana had been engaged to Thorp at the time that law enforcement had served Thorp with the order of protection.

4

Jordana had met Thorp through her mother, Barbara. Jordana and Thorp were living with Barbara in North Dakota. Thorp and Barbara previously had been in a relationship together. Jordana testified that Thorp had told Jordana and Barbara that the order of protection might have resulted from an encounter with M.A. in 2006 in which M.A. had initiated a "blow job" and he had failed to stop it. Barbara also testified that she had heard Thorp admit to this alleged incident with M.A.

¶17 Jordana broke off her engagement to Thorp after the State charged Thorp with sexual intercourse without consent and incest. Barbara then resumed her relationship with Thorp. In fact, Barbara visited Thorp in jail and helped him attempt to obstruct the investigation. Barbara retrieved Thorp's cell phone and deleted text messages between Thorp and his brother Dean. The State managed to retrieve the text messages and a photo of M.A. on Thorp's phone that Barbara had deleted. Barbara also testified that Thorp had requested that Barbara ask T.C., a fourteen year old boy, to leave a threatening note on M.A.'s car. T.C. testified that he had written the note as a favor to Barbara, but he did not know who had placed it on M.A.'s car. The note stated "come forward with the truth or your family will be sued for everything that your family has. That means drop this lie." M.A. testified that she had been frightened when she found this note.

¶18 The State's counsel noted to the jury during closing argument that M.A. was 15 years old at the time of the attack and thus was unable to consent. The State's counsel further highlighted his belief that M.A.'s testimony contained all of the elements necessary to convict Thorp of sexual intercourse without consent. The State's counsel suggested that the

only question remaining for the jury was "whether you believe her." The State's counsel urged the jury to believe M.A.: "I think you will find that M.A. is a very credible witness …. She has no reason to lie, and I think you will believe her. I think you should." The State offered similar statements during the rest of its closing argument.

¶19 Thorp's counsel waited until the conclusion of the State's closing argument before raising an objection. Thorp argued that the State impermissibly had vouched for M.A. Thorp asked for a cautionary instruction for the jury rather than requesting a mistrial. The District Court read the jury a cautionary instruction regarding the State's alleged vouching for M.A.'s credibility. The instruction advised the jury that it is impermissible for a lawyer to vouch for a witness, and if the jurors believe the State indeed had vouched for M.A.'s credibility, they were to "discard those comments."

¶20 Thorp later objected to the State's proposed jury instruction that defined "without consent" for sexual intercourse without consent. The State offered a definition of "without consent" that read "the victim is incapable of consent because she is less than 16 years old." Thorp argued that all of the allegations in the information, and the evidence presented by the State during trial, claimed that Thorp's forcible rape had rendered M.A. incapable of consenting. The court accepted the State's instruction defining "without consent" based upon age.

¶21 The jury convicted Thorp of one count of sexual intercourse without consent. The District Court sentenced Thorp to life in the Montana State Prison without the possibility of parole. Thorp filed a motion for a new trial under § 46-16-702, MCA. Thorp argued that the

6

State's alleged vouching for M.A.'s credibility, the court's use of the State's age instruction for "without consent," and improperly admitted other acts evidence warranted a new trial. The District Court denied Thorp's motion. Thorp appeals.

**DISCUSSION**

¶22 *Did the State's counsel and a State witness impermissibly vouch for the complaining witness?*

¶23 We review for abuse of discretion a district court's rulings on the admissibility of evidence. *State v. Hayden*, 2008 MT 274, ¶ 16, 345 Mont. 252, 190 P.3d 1091. We generally will not review issues not raised before the district court. We may undertake review of such an issue, however, under the plain error doctrine. *Hayden*, ¶ 17. This Court invokes plain error review sparingly. We apply plain error review only in situations that implicate a defendant's fundamental constitutional rights when failing to review the alleged error may result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the proceedings, or compromise the integrity of the judicial process. *Hayden*, ¶ 17.

¶24 This Court consistently has held that the determination of the credibility of witnesses and the weight given to their testimony rests solely within the province of the jury. *Hayden*, ¶ 26. A witness may not comment on the credibility of another witness's testimony and it is improper for a prosecutor to "offer personal opinions" as to witness credibility. *Hayden*, ¶¶ 26, 28. The Court in *Hayden* determined that a police officer impermissibly had vouched for two witnesses at trial. *Hayden*, ¶ 31. The prosecutor in *Hayden* went so far as to ask the

7

officer directly whether he believed the two complaining witnesses had told the truth when the officer interviewed them. Further, the prosecutor had proceeded with an entire line of questioning regarding the witnesses' credibility and the officer's training in assessing witness believability. *Hayden*, ¶ 12.

¶25 We decline to exercise plain error review based upon the record before us. The State asked Deputy Power the open-ended question, "what was your reaction to hearing this news from M.A.?" The State immediately moved on to other questions after Deputy Power responded that "it seemed credible." The record does not reveal, as it did in *Hayden*, that the State was attempting to elicit a certain response from Deputy Power regarding M.A.'s credibility. Deputy Power's response does not rise to the level of impermissible vouching that would warrant plain error review. *Hayden*, ¶ 31.

¶26 We turn to the State's comments during closing arguments. A prosecutor may comment during closing argument on the credibility of witnesses. *State v. Green*, 2009 MT 114, ¶ 33, 350 Mont. 141, 205 P.3d 798. A prosecutor may not offer personal opinions on witness credibility. *Green*, ¶ 33. A prosecutor may comment, however, on "conflicts and contradictions in testimony, as well as to comment on the evidence presented and suggest to the jury inferences which may be drawn therefrom." *Green*, ¶ 33.

¶27 The jury heard conflicting testimony at Thorp's trial regarding the place of the alleged attack, the date of the alleged attack, and the type of sexual contact between Thorp and M.A. It appears that neither the State, nor Thorp, anticipated some of the testimony that surfaced for the first time during trial. For example, M.A. testified that Thorp had raped her in

8

January of 2006 on Pirogue Island. Hucking testified, by contrast, that Thorp had raped M.A. sometime in the late summer of 2006 at Dawn's house, only days before M.A. had confided in her. The State seemed surprised at this answer, and asked Hucking whether she had ever told anyone before trial that she believed Thorp had raped M.A. at Dawn's house sometime in the summer of 2006. Hucking responded that she had never mentioned this fact in earlier interviews.

¶28 Likewise, Jordana and Barbara England both testified that Thorp had admitted to them that the order of protection may have arisen from an unsolicited "blow job" sometime during 2006. Both Jordana and Barbara also conceded that neither of them had mentioned the alleged "blow job" incident to investigators before trial. Jordana testified that she had failed to tell Thorp's investigator that Thorp had said the order of protection likely had arisen from the "blow job." Barbara similarly testified that at a previous hearing she had failed to mention this incident. The State's comments must be viewed in light of this contradictory testimony.

¶29 Moreover, Thorp informed the court at the end of the State's closing argument that he did not want to move for a mistrial and that he preferred that the court provide a cautionary instruction to the jury. This Court considers the effect of a cautionary instruction in light of the other evidence presented against the defendant. *State v. Wing*, 2008 MT 218, ¶ 34, 334 Mont. 243, 188 P.3d 999. We generally deem cautionary instructions sufficient if the defendant does not object further or move for a mistrial. *Wing*, ¶ 34.

9

¶30 Thorp's counsel specifically told the court he did not want to move for a mistrial. The District Court even noted in its order that Thorp actively had been involved with his counsel in making the "carefully thought out tactical decision" to request a curative instruction instead of a mistrial. We deem the court's cautionary instruction sufficient under the circumstances to remedy any alleged infringement on Thorp's constitutional right to a fair trial.

¶31 *Did the District Court properly instruct the jury on the definition of without consent in the context of the sexual intercourse without consent charge?*

¶32 Thorp argues that the State's jury instruction of "without consent" prevented the jury from reaching a unanimous decision. We review for abuse of discretion whether a district court correctly instructed the jury. We consider whether the jury instructions "fully and fairly instructed the jury on the law applicable to the case." *State v. Cybulski*, 2009 MT 70, ¶ 34, 349 Mont. 429, 204 P.3d 7.

¶33 The State initially offered two instructions to define sexual intercourse without consent. Jury instruction #16 defined "without consent" as the victim being compelled to submit by force. Jury instruction #17 defined "without consent" as the victim being incapable of consent based upon being under the age of 16. The State finally submitted, and the District Court accepted, jury instruction #17 that defined "without consent" based upon age. Thorp argues, however, that the information filed by the State alleged force. Thorp argues further that the State offered conflicting testimony that prevented the jury from reaching a unanimous verdict based upon similar factual elements.

10

¶34     Thorp compares his claim to *State v. Hardaway*, 2001 MT 252, 307 Mont. 139, 36 P.3d 900, where this Court determined that the district court's improper jury instructions had denied Hardaway his right to a unanimous verdict. *Hardaway*, ¶ 71. The State had charged Hardaway with burglary. The State alleged in its amended information that Hardaway "intended to commit either a theft or a sexual crime against the victim." *Hardaway*, ¶ 68. The court failed to instruct Hardaway's jury that it had to reach a unanimous decision on whether Hardaway intended to commit a theft or whether he intended to commit a sexual crime. *Hardaway*, ¶ 71. This Court reversed Hardaway's conviction on the basis that the jury "must be in agreement as to the principal factual elements underlying a specified offense." *Hardaway*, ¶ 70.

¶35     Unlike *Hardaway*, however, the State proceeded against Thorp under the single theory that Thorp had raped M.A. on Pirogue Island in January of 2006. Sexual intercourse without consent involves knowingly engaging in sexual intercourse without the consent of another person. Section 45-5-503(1), MCA. Sexual intercourse means the penetration of the vulva, anus, or mouth of one person by the penis or body member of another person, or by foreign instrument, knowingly or purposefully to cause bodily injury or arouse either party. Section 45-2-101(68), MCA.

¶36     The statute defines "without consent" either as the victim being compelled to submit by force or being incapable of consent for a variety of circumstances, including age. Section 45-5-501(1)(a), MCA. Thorp does not dispute that M.A. was fifteen years old in January of 2006. The court properly instructed the jury that M.A. could not consent to any sexual

11

contact with Thorp due to the fact that she was under the age of sixteen at the time of the attack. M.A.'s age settled the "without consent" element of the offense. Section 45-5-501(1)(a), MCA.

¶37 The State's satisfaction of the "without consent" element of the offense left the jury to resolve any dispute about whether any sexual contact had taken place between Thorp and M.A. in January of 2006. Thorp does not challenge the court's jury instructions regarding the knowing or intentional element of the offense or the sexual intercourse element. Section 45-5-503(1), MCA. The court's jury instructions "fully and fairly instructed the jury on the law applicable to the case." *Cybulski*, ¶ 34.

¶38 *Did the District Court abuse its discretion by denying Thorp's motion for a new trial?*

¶39 Thorp raises three separate issues with respect to his claim that the District Court improperly denied his motion for a new trial. We review for abuse of discretion a district court's denial of a motion for a new trial. *State v. Makarchuk*, 2009 MT 82, ¶ 14, 349 Mont. 507, 204 P.3d 1213. We already have determined that the District Court did not abuse its discretion regarding the State's alleged vouching for M.A.'s credibility and the granting of the jury instruction regarding "without consent." ¶¶ 25, 30 and 37.

¶40 Thorp also argues that the District Court impermissibly admitted other acts evidence under M. R. Evid. 404(b) when it allowed Jordana and Barbara England to testify regarding Thorp's admission of an alleged "blow job" by M.A. at some point during 2006. This Court may review the verdict or decision and "any alleged error objected to" that involves the merits or affects the judgment. Section 46-20-104(2), MCA. The purpose of stating an

objection is to allow the district court to correct itself and to preserve the issue for appeal. *State v. Price*, 2007 MT 269, ¶ 15, 339 Mont. 399, 171 P.3d 293. Thorp's trial counsel did not object to either Jordana's or Barbara's testimony regarding the alleged "blow job." Thorp's trial counsel actively participated in the line of questioning that elicited Jordana's and Barbara's unexpected testimony. Thorp waived his right to challenge this testimony on appeal. *Price*, ¶ 17.

¶41 *Did the District Court impose a sentence on Thorp that amounted to cruel and unusual punishment?*

¶42 We review criminal sentences for legality to determine whether they are within the parameters set by statute. *Makarchuk*, ¶ 14. A sentence that falls within the statutory guidelines generally does not violate the constitutional prohibitions against cruel and unusual punishment. *State v. Shults*, 2006 MT 100, ¶ 30, 332 Mont. 130, 136 P.3d 507. This Court recognizes an exception to the general rule only when a sentence is "so disproportionate to the crime that it shocks the conscience and outrages the moral sense of the community or of justice." *Shults*, ¶ 30.

¶43 The jury convicted Thorp of sexual intercourse without consent under § 45-5-503(3)(c)(ii), MCA. Thorp previously had been convicted of sexual intercourse without consent in another state. Section 45-5-503(3)(c)(ii), MCA, requires that offenders with previous convictions for sex offenses "shall be" punished as provided in § 46-18-219, MCA. Section 46-18-219, MCA, allowed for Thorp's sentence of life imprisonment without parole. Thorp's sentence falls within the statutory guidelines set forth in § 45-5-503(3)(c)(ii), MCA.

13

We also decline to recognize an exception to the general rule regarding legal sentences. The court's sentence neither "shocks the conscience," nor "outrages the moral sense of the community or of justice" in light of Thorp's previous conviction for sexual intercourse without consent and the nature of the offense underlying Thorp's conviction here.

¶44    Affirmed.

/S/ BRIAN MORRIS

We Concur:

/S/ MIKE McGRATH

/S/ MICHAEL E WHEAT
/S/ PATRICIA O. COTTER

Justice James C. Nelson specially concurs.

¶45 I agree that we should decline to exercise plain error review of Deputy Power's comment. Opinion, ¶ 25. I would, therefore, leave it at that and not go on, as the Court does, to conduct plain error review. Opinion, ¶¶ 24-25. *See State v. Jackson*, 2009 MT 427, ¶ 75, 354 Mont. 63, 221 P.3d 1213 (Nelson, J., specially concurring).

¶46 "[P]lain error" is defined as:

An error that is so obvious and prejudicial that an appellate court should *address it* despite the parties' failure to raise a proper objection at trial. • A plain error is often said to be so obvious and substantial that failure *to correct it* would infringe a party's due-process rights and damage the integrity of the judicial process.

*Black's Law Dictionary* 622 (Bryan A. Garner ed., 9th ed., Thomson Reuters 2009) (emphases added). Plain error review is a matter of judicial discretion. *See State v. Finley*, 276 Mont. 126, 137, 915 P.2d 208, 215 (1996), *overruled on other grounds, State v. Gallagher*, 2001 MT 39, ¶ 21, 304 Mont. 215, 19 P.3d 817. Thus, if we decide not to exercise plain error review, as we have decided in the instant case, Opinion, ¶ 25, then we should *not* discuss the merits of the appellant's claim. Indeed, by discussing the merits, we necessarily conclude that, on the basis of the issue and argument raised by the appellant, there is no error. By discussing the merits, we have in fact "reviewed" or "addressed" the

15

claim and found no error. In short, we effectively and necessarily have decided that plain error review is appropriate.

¶47 While there are cases in which I may believe that the claim of error is, in fact and in law, meritorious—*had it been objected to*—I may also believe that this Court should not address the claim of error because our plain error review criteria have not been met. Specifically, the error must implicate a fundamental constitutional right. Additionally, we use the plain error review sparingly, on a case-by-case basis, and *only* where failing to review the claimed error "may result in a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process." *State v. West*, 2008 MT 338, ¶ 23, 346 Mont. 244, 194 P.3d 683.

¶48 The question of whether the alleged error is in fact error, and the question of whether the claim should be reviewed under the plain error doctrine, are two completely separate inquiries involving different criteria and considerations. Thus, by discussing the merits of the claimed error in explanation of why we are not engaging in plain error review—as we do here and as we did in *Jackson* and numerous other cases—we simply collapse the claim of error, plain error review, and the merits arguments into one unrecognizable hodgepodge. We have, in fact, "reviewed" or "addressed" the claim and found there to be no error. And, worse, in doing so, we have appeared to set precedent on the merits with what is, essentially, dicta—which of course, one side or the other is always happy to cite as the law.

16

¶49    While I agree that we should not exercise plain error review here, I do not agree with our approach which goes beyond declining plain error review and, in fact, addresses and resolves the claim of error on the merits, merely giving lip service to the plain error doctrine itself and the rule that we use that doctrine sparingly. A request for plain error review should be denied or granted on the basis of the criteria for plain error review, not on the merits of the underlying argument.

¶50    With that caveat, I otherwise concur in the Court's Opinion.


                                                     /S/ JAMES C. NELSON