No. OP 07-0134

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 149

_____

BRANDEN MILLER and JOHN ALBERT LeBRUM, )
                                        )
              Petitioners,              )          O P I N I O N
                                        )
         v.                             )          A N D
                                        )
EIGHTEENTH JUDICIAL DISTRICT COURT,     )          O R D E R
GALLATIN COUNTY, THE HONORABLE          )
MIKE SALVAGNI, DISTRICT JUDGE,          )
                                        )
              Respondent.               )
_____

¶1   Before this Court is a Petition for Writ of Supervisory Control ("Petition") filed by Branden Miller and John Albert LeBrum (collectively, "Petitioners"). On February 28, 2007, we issued an order granting Respondent District Court, the Attorney General, and the Gallatin County Attorney twenty days in which to file a response to the Petition. A response was filed by the Attorney General on March 20, 2007.

¶2   Having considered the parties' arguments, we grant the Petition, reverse the decision of the District Court denying Petitioners' respective motions to preclude the State from seeking the death penalty upon their convictions, and remand for further proceedings consistent with this Opinion and Order.

**ISSUES**

¶3   1. Are the issues presented by Petitioners appropriate for resolution by this Court through a writ of supervisory control?

1

¶4     2. Did the District Court err in denying Petitioners' motions to preclude the State from seeking the death penalty and to preclude imposition of the death penalty as a sentence?

## FACTUAL AND PROCEDURAL BACKGROUND

¶5     Petitioners are presently defendants in cause numbers DC 06-213B (Miller) and DC 06-212B (LeBrum) filed in the District Court for the Eighteenth Judicial District, Gallatin County.  They are accused of deliberate homicide, aggravated kidnapping, and tampering with or fabricating physical evidence, all felonies, and the Gallatin County Attorney has given notice stating that he intends to seek the death penalty in both cases.

¶6     However, the prosecutor did not file this notice in compliance with this Court's Standards for Competency of Counsel for Indigent Persons in Death Penalty Cases ("the Standards").  Specifically, Standard I.1.a. of the Standards states:

> In any case in which death is a potential punishment, the prosecutor shall comply with Section 46-1-401, MCA, and shall file with the district court, within 60 days after arraignment, and serve upon counsel of record a notice stating whether the prosecutor intends to seek the death penalty upon a conviction in the case.

The prosecutor complied with § 46-1-401, MCA, by alleging aggravating circumstances in each Information; but Petitioners were arraigned on July 18, 2006, and the prosecutor, therefore, was required by Standard I.1.a. to file notice stating whether he intended to seek the death penalty by September 18, 2006.[1]  He did not do so.

---

[1] The sixtieth day fell on September 16, 2006; but because that was a Saturday, the prosecutor had until Monday, September 18, 2006, to file the notice.  M. R. Civ. P. 6(a).

2

¶7 Consequently, on November 8, 2006, Petitioners filed separate motions to preclude the State from seeking the death penalty and to preclude imposition of the death penalty as a sentence. Petitioners based their motions (which contained essentially the same legal arguments and analysis) on the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution and Article II, Section 17 of the Montana Constitution, the Cruel and Unusual Punishments Clauses of the Eighth Amendment to the United States Constitution and Article II, Section 22 of the Montana Constitution, and on this Court's constitutional rulemaking authority (Mont. Const. art. VII, § 2(3)) pursuant to which the Standards were promulgated. With respect to our constitutional rulemaking authority, Petitioners contended that the Standards were "validly enacted" by this Court, that the Standards are "in full force and effect" in Petitioners' cases, and that the Standards "provide for no exception to the sixty-day notice requirement." Thus, because the prosecutor did not file his notice of intent[2] within 60 days after Petitioners' arraignments, as required by Standard I.1.a., they argued that the State is precluded from seeking the death penalty upon their convictions.

¶8 On November 27, 2006—132 days after Petitioners' arraignments and 72 days after the Standard I.1.a. deadline—the prosecutor filed his notice of intent to seek the death penalty. That same day, he also filed a response to Petitioners' motions, in which he argued that "[b]ecause the Information filed in both cases specifies that death is a

---

[2] Standard I.1.a. requires "a notice stating whether the prosecutor intends to seek the death penalty upon a conviction in the case." For convenience, we will use the term "notice of intent" to refer to this required notice.

possible punishment, and specifies the aggravating circumstances that may lead to a death sentence, the Defendants have since the inception of this case been fully aware of the possible consequences of conviction." He also argued that "[w]hat is more important, and what the State asks this Court to focus upon in deciding Defendants' motions, is that the Defendants have not been prejudiced by the undersigned's failure, until this date, to file the notice required by the Standards." In this regard, he contended that Petitioners had failed in their motions to show that they had been prejudiced by the late filing of his notice of intent (although the Standards do not explicitly require such a showing).

¶9      On December 11, 2006, LeBrum filed a combined reply to the prosecutor's response, objection to the prosecutor's late filing of his notice of intent, and motion to strike said notice, in which Miller joined. Acknowledging that he was aware the case was a *potential* capital case, he contended that such knowledge does not transform the case into an *actual* capital case. Rather, "the State must comply with all pleading, procedural, and notice requirements, including [Standard I.1.a.,] to convert a *potential* capital case into an *actual* capital case."

¶10     LeBrum also contested the factual accuracy of the prosecutor's assertion (in his November 27, 2006 response) that "Defense counsel have at all times been aware that this case was a death penalty case." Citing a recent article in the Bozeman Daily Chronicle (*see* Ted Sullivan, *Defense argues against death penalty in Wright homicide case*, Bozeman Daily Chronicle A3 (November 14, 2006)), LeBrum pointed out that

> the prosecutor himself stated he has not decided whether he will seek the death penalty, and that he won't decide whether he'll seek the death penalty until he receives all of the evidence in the case and discusses capital

4

punishment with the victim's family. [Citation to article.] Since the prosecutor has admitted that even he did not know if he intended to seek the death penalty, it is contradictory and disingenuous for the prosecutor to allege the Defendant knew all along that the prosecutor intended to seek the death penalty.

¶11 Finally, with respect to the prosecutor's argument that Petitioners had not been prejudiced by the late filing of his notice of intent, LeBrum maintained that the Standards contain no exception to the 60-day deadline based on lack of prejudice to the defendant. He pointed out that this Court had deleted such an exception from Standard I.1. in the 2002 amendments to the Standards.

¶12 The District Court issued a Decision and Order in each cause number on January 9, 2007, applying the same analysis in each. Reasoning that the Standards "are silent as to the consequences of the prosecutor's failure to file the required notice" and that "absent prejudice, the violation of a procedural rule designed to safeguard a constitutional right is not necessarily the same thing as a violation of the right itself" (alteration and internal quotation marks omitted), the court adopted the approach suggested by the prosecutor—i.e., the court focused on whether Petitioners had been prejudiced by the prosecutor's late filing of his notice of intent.

¶13 In this regard, the court observed that "Defendant was aware of the possible imposition of the death penalty at the inception of this case" and that "Defendant [now] has advance notice of the State's intent to seek the death penalty in order for the Defendant to prepare an adequate defense." Therefore, the court concluded, "the State's failure to file the notice within the time prescribed by the Standard has not prejudiced the Defendant and has not violated Defendant's rights to due process under the United States

5

and Montana Constitutions." Accordingly, the court denied Petitioners' motions to preclude the State from seeking the death penalty and to preclude imposition of the death penalty as a sentence. The court also denied Petitioners' objections to the prosecutor's late filing of his death penalty notice and Petitioners' motions to strike said notice.

¶14 Petitioners filed the instant Petition for Writ of Supervisory Control on February 15, 2007. They contend that the District Court's decision constitutes a mistake of law and is causing a gross injustice. They further contend that no adequate remedy exists on appeal. Accordingly, Petitioners request that this Court exercise supervisory control over these cases, review the District Court's decision, and preclude the State from seeking the death penalty upon their convictions.

**DISCUSSION**

¶15 *Issue 1. Are the issues presented by Petitioners appropriate for resolution by this Court through a writ of supervisory control?*

¶16 This Court has "general supervisory control over all other courts" pursuant to Article VII, Section 2(2) of the Montana Constitution. Supervisory control, however, is "an extraordinary remedy" to be exercised only in "extraordinary circumstances." *Evans v. Montana Eleventh Judicial Dist. Court*, 2000 MT 38, ¶ 15, 298 Mont. 279, ¶ 15, 995 P.2d 455, ¶ 15; *Park v. Montana Sixth Judicial Dist. Court*, 1998 MT 164, ¶ 13, 289 Mont. 367, ¶ 13, 961 P.2d 1267, ¶ 13. Thus, we have explained that we exercise supervisory control only when a district court is proceeding under a mistake of law and, in so doing, is causing a gross injustice, and the normal appeal process is not an adequate remedy. *Evans*, ¶ 15; *Park*, ¶ 13; *Plumb v. Montana Fourth Judicial Dist. Court*, 279

6

Mont. 363, 369-70, 927 P.2d 1011, 1015-16 (1996). We make this determination on a case-by-case basis. *Inter-Fluve v. Montana Eighteenth Judicial Dist. Court*, 2005 MT 103, ¶ 17, 327 Mont. 14, ¶ 17, 112 P.3d 258, ¶ 17; *Dusek v. Montana Eighth Judicial Dist. Court*, 2003 MT 303, ¶ 6, 318 Mont. 166, ¶ 6, 79 P.3d 292, ¶ 6.[3]

¶17    On December 15, 1997, during the period in which this Court was receiving public comment on the Proposed Standards for Competency of Counsel for Indigent Persons in Death Penalty Cases, the Attorney General filed a response to comments filed by the Appellate Defender and the Federal Defender. Addressing the concern that trial courts might "be free to disregard the competency standards with impunity," the Attorney General took the position that "coercive remedies such as mandamus, that are designed to compel the court to follow the law," would be available in situations where the trial court failed to follow the Standards. For instance, he noted that "[t]he law creates a duty on the part of the trial judge to appoint counsel meeting the standards," and "[i]f the court fails in this duty, nothing in the law would prevent the petitioner from seeking mandamus or other extraordinary relief in this Court to require that the law be followed."

¶18    Without distinguishing its earlier position, however, the State now argues that the District Court's failure to enforce Standard I.1.a.'s 60-day deadline does not warrant extraordinary relief and that this Court should decline Petitioners' request that we

---

[3] We note that our statement in *Dusek* that supervisory control "is only appropriate when a district court is proceeding under a mistake of law which, if uncorrected, would cause *insignificant* injustice," *Dusek*, ¶ 6 (emphasis added), is mistaken. The correct rule is that supervisory control is only appropriate when a district court is proceeding under a mistake of law which, if uncorrected, would cause *significant*—i.e., gross—injustice.

exercise supervisory control. The State reasons that if Petitioners are convicted and the District Court thereafter imposes a sentence of death, "then Petitioners may challenge any and all of the district court's pretrial decisions . . . in the course of a direct appeal." The State urges that "[t]he fact that the case involves the possible imposition of the death penalty does not render the remedy of appeal inadequate." Rather, in the State's view, "Petitioners have a wholly adequate remedy of appeal." We disagree.

¶19 We find the circumstances faced by Petitioners here to be analogous to the circumstances faced by the petitioner in *Booth v. Montana Twenty-First Judicial Dist. Court*, 1998 MT 344, 292 Mont. 371, 972 P.2d 325. In *Booth*, Booth's application for a writ of supervisory control implicated double jeopardy considerations: "If the District Court's conclusion that the prosecution is not barred proved—on appeal—to be incorrect, Booth would have been subjected to prosecution notwithstanding his entitlement to avoid the prosecution altogether." *Booth*, ¶ 6. We concluded that under such circumstances, appeal would not be an adequate remedy and that Booth's application presented legal issues that were appropriate for this Court to resolve through a writ of supervisory control. *Booth*, ¶ 6.

¶20 Here, the District Court concluded that the Standards did not bar the prosecutor from filing his notice of intent to seek the death penalty 72 days after Standard I.1.a.'s 60-day deadline had expired and from seeking the death penalty upon Petitioners' convictions. As explained below under Issue 2, this conclusion is incorrect. Thus, the District Court is proceeding under a mistake of law and, as a result, Petitioners are being subjected to prosecutions as capital defendants, notwithstanding their entitlement to avoid

8

being prosecuted as such altogether.  For this reason, the District Court's ruling is causing a gross injustice for which an appeal after trial is not an adequate remedy.  Under these circumstances, we hold that the issues presented in the Petition are appropriate for resolution by this Court through a writ of supervisory control.

¶21 ***Issue 2. Did the District Court err in denying Petitioners' motions to preclude the State from seeking the death penalty and to preclude imposition of the death penalty as a sentence?***

### Standard of Review

¶22 The District Court's conclusion that the prosecutor was permitted to file his notice of intent to seek the death penalty after the 60-day deadline had expired was based on the court's interpretation and construction of the Standards.  Interpretation and construction of a rule of procedure, like interpretation and construction of a statute, is a matter of law, which we review de novo, determining whether the court's interpretation and construction of the rule is correct.  *See Associated Press v. Montana Senate Republican Caucus*, 286 Mont. 172, 176, 951 P.2d 65, 67 (1997); *Faulconbridge v. State*, 2006 MT 198, ¶¶ 24, 46-57, 333 Mont. 186, ¶¶ 24, 46-57, 142 P.3d 777, ¶¶ 24, 46-57; *Madrid v. Zenchiku Land and Livestock*, 2002 MT 172, ¶ 5, 310 Mont. 491, ¶ 5, 51 P.3d 1137, ¶ 5.

### Clarification of the Issue

¶23 At the outset, we note that Petitioners advance several theories of relief in addition to their arguments based on this Court's constitutional rulemaking authority.  In particular, Petitioners renew their arguments under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article II, Sections 17 and 22 of the Montana Constitution.  In addition, Petitioners supplement their arguments by pointing

9

out that heightened procedural safeguards are required in death penalty cases. *See Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S. Ct. 2978, 2991 (1976) (Opinion of Stewart, Powell, and Stevens, JJ.) ("[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. . . . Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."); *see also Lankford v. Idaho*, 500 U.S. 110, 125-26, 111 S. Ct. 1723, 1732 (1991); *Ring v. Arizona*, 536 U.S. 584, 605-06, 122 S. Ct. 2428, 2441-42 (2002). We do not find it necessary, however, to decide this case on a "death is different" rationale or based on the foregoing constitutional provisions cited by Petitioners. Rather, we find this Court's rulemaking authority under Article VII, Section 2(3) of the Montana Constitution to be a sufficient basis on which to resolve this case.

¶24 Article VII, Section 2(3), provides that this Court "may make rules governing appellate procedure, *practice and procedure for all other courts*, admission to the bar and the conduct of its members" (emphasis added). Article VII, Section 2(3), also states that "[r]ules of procedure shall be subject to disapproval by the legislature in either of the two sessions following promulgation."

¶25 Pursuant to this constitutional rulemaking authority, and at the request of the Legislature and the Attorney General (*see* Laws of Montana, 1997, Ch. 378, § 7, at 1767), this Court on June 29, 1999, adopted the Standards, which became effective on January 1, 2000. The Standards specify a number of procedures concerning the appointment of counsel to represent indigent persons in death penalty cases at the trial

10

and appellate levels and in state postconviction proceedings. They also set forth standards for competency of such counsel. The Standards have remained unchanged through the present, with the exception of Standard I.1. (detailing the content and filing deadline of the prosecutor's notice of intent to seek the death penalty), which we amended on July 16, 2002.

¶26    Standard I.1.a. (as amended July 16, 2002) provides:

> In any case in which death is a potential punishment, the prosecutor shall comply with Section 46-1-401, MCA, and shall file with the district court, within 60 days after arraignment, and serve upon counsel of record a notice stating whether the prosecutor intends to seek the death penalty upon a conviction in the case.

The State does not dispute Petitioners' contention that this provision, which was not disapproved by the Legislature in either of the two sessions following promulgation (i.e., in the 2003 or 2005 sessions), is a valid enactment pursuant to this Court's constitutional rulemaking authority. Indeed, the Attorney General's June 23, 1997 petition asking this Court to establish the Standards was explicitly premised on our authority under Article VII, Section 2(3). Likewise, it is uncontroverted that Standard I.1.a. is applicable to cause numbers DC 06-213B (Miller) and DC 06-212B (LeBrum), which are "case[s] in which death is a potential punishment." Thus, the validity and applicability of Standard I.1.a. are not at issue here.

¶27    However, conceding that the prosecutor filed his notice of intent to seek the death penalty upon Petitioners' convictions 72 days late, the State seeks to avoid Standard I.1.a.'s time prescription—"within 60 days after arraignment"—on the ground that it is subject to exceptions. In particular, the State argues that "Petitioners and their counsel

11

were well aware, from the onset of the cases, that the death penalty was a potential punishment" and that "[t]he prosecutor's notice was filed sufficiently in advance of trial so that Petitioners will have a full opportunity to defend the case as a capital case." Thus, in the State's view, the District Court did not err in allowing the untimely notice of intent to stand.

¶28   The precise issues before us, therefore, are (1) whether the Standards contain an exception to Standard I.1.a.'s 60-day deadline and (2)(a) if the Standards contain an exception, does it apply on the facts of this case or (b) if the Standards do not contain an exception, what are the consequences of a prosecutor's failure to file the required notice of intent in accordance with the 60-day deadline.

### Whether the Standards Contain an Exception to Standard I.1.a.'s 60-Day Deadline

¶29   We first observe that the State cites no textual support in the Standards for a "no harm, no foul" exception to the 60-day deadline. The only provision mentioned by the State is Section IV of the Standards; but Section IV merely provides that "[n]o error or omission in the procedure outlined in the trial [Section I] or appellate [Section II] standards shall constitute a ground for relief from a conviction or sentence unless the defendant shows that the standards were not followed in a material way." Assuming, *arguendo*, this provision applies equally to grounds for relief presented in a petition for writ of supervisory control, filing the required notice of intent 72 days late clearly is a "material" violation of Standard I.1.a. Thus, Section IV does not support the State's position.

¶30 Alternatively, the State cites *State v. Lee*, 917 P.2d 692 (Ariz. 1996), *State v. Jackson*, 918 P.2d 1038 (Ariz. 1996), *State v. Shults*, 2006 MT 100, 332 Mont. 130, 136 P.3d 507, and *United States v. Allen*, 406 F.3d 940 (8th Cir. 2005), as authority for recognizing an exception to Standard I.1.a. (The District Court identified these same four cases as the basis for its decision.) Petitioners, for their part, cite *State v. Second Judicial Dist. Court*, 11 P.3d 1209 (Nev. 2000), *State v. Luvene*, 903 P.2d 960 (Wash. 1995), and *State v. Smallwood*, 152 P.3d 821 (N.M. 2007), for the proposition that the 60-day deadline is firm. We commend the breadth of the parties' research; however, having fully considered the import of these cases, we find them materially distinguishable from the case at hand.

¶31 Unlike Standard I.1.a., the timeliness rule at issue in *Lee* and *Jackson* specifies sanctions to be imposed by the trial court, in its discretion, if the prosecutor violates the rule, *see Lee*, 917 P.2d at 698-99; *Jackson*, 918 P.2d at 1042, and one such sanction is simply "ordering disclosure of the information not previously disclosed," *Lee*, 917 P.2d at 698 (internal quotation marks omitted). Likewise, the timeliness rules at issue in *Second Judicial Dist. Court*, *Luvene*, and *Smallwood* explicitly permit the prosecutor's notice of intent to be filed late (in the trial court's discretion and if good cause is shown). *See Second Judicial Dist. Court*, 11 P.3d at 1216; *Luvene*, 903 P.2d at 973; *Smallwood*, 152 P.3d at 825-26.

¶32 The timeliness rule at issue in *Shults* is similarly distinguishable from Standard I.1.a. That rule permits the required notice to be filed late "for good cause shown." Section 46-13-108(1), MCA. Moreover, the rule is explicitly subject to an exception—

namely, § 46-20-701(1), MCA, which states that "[a] cause may not be reversed by reason of any error committed by the trial court against the convicted person *unless the record shows that the error was prejudicial*" (emphasis added). In other words, while the Legislature provided that notice of the prosecutor's intent to seek treatment of the accused as a persistent felony offender "must be given at or before the omnibus hearing," § 46-13-108(1), MCA, and that such notice "must specify the alleged prior convictions," § 46-13-108(2), MCA, the Legislature also provided that a defendant claiming a violation of this rule must show that he or she was prejudiced by the violation, § 46-20-701(1), MCA. It was on this basis that we required a showing of prejudice in both *State v. McQuiston*, 277 Mont. 397, 408-09, 922 P.2d 519, 526-27 (1996), and *Shults*, ¶¶ 22-23 (citing *McQuiston*, 277 Mont. at 409, 922 P.2d at 527). Thus, contrary to the State's and the District Court's supposition, we did not read a no-prejudice exception into § 46-13-108, MCA, and *Shults* is not authority to do so in the present cases.

¶33 Lastly, at issue in *Allen* was the Fifth Amendment requirement that at least one statutory aggravating factor and the mens rea requirement (which, if proved to the trial jury beyond a reasonable doubt, make the defendant eligible for the death penalty) must be found by the grand jury and charged in the indictment. *See Allen*, 406 F.3d at 943. This notice requirement, however, is subject under existing federal precedents to harmless error analysis. *See Allen*, 406 F.3d at 943-45. Thus, after concluding that Allen's indictment suffered a Fifth Amendment defect, the court proceeded to inquire whether this defect was harmless beyond a reasonable doubt. *See Allen*, 406 F.3d at 945-

14

49.[4]  For these reasons, we conclude that *Allen*, *Shults*, *Lee*, *Jackson*, *Second Judicial Dist. Court*, *Luvene*, and *Smallwood* are inapposite for the purpose of interpreting Standard I.1.a.

¶34    Taking a slightly different approach, the State relies on *State v. Sol*, 282 Mont. 69, 936 P.2d 307 (1997), and *Lankford v. Idaho*, 500 U.S. 110, 111 S. Ct. 1723 (1991), for the proposition that Petitioners were entitled only to "adequate" notice of the possible imposition of a death sentence and the opportunity to present argument and evidence against such sentence, both of which the State maintains have been provided here.  The District Court engaged in similar reasoning in denying Petitioners' motions, concluding that due process had been satisfied because Petitioners have advance notice of the prosecutor's intent to seek the death penalty such that they can prepare adequate defenses thereto.

¶35    In so doing, however, the State and the District Court erroneously conflated two distinct claims advanced by Petitioners—namely, their constitutional due process claim and their claim based on Standard I.1.a.'s mandate.  These two claims are not coextensive.  Even if constitutional due process does not require any more notice than Petitioners received here, Petitioners still may be entitled to relief based on the notice requirements established pursuant to this Court's constitutional rulemaking authority.  *Cf. Smallwood*, 152 P.3d at 825 (holding that Rule 5-704(A), NMRA, which was

---

[4] As an aside, in concluding that the Fifth Amendment error was, in fact, harmless beyond a reasonable doubt, the court pointed out that the government's notice of intent to seek the death penalty had been timely filed.  *See Allen*, 406 F.3d at 946.

promulgated under the New Mexico Supreme Court's constitutional authority to exercise superintending control over all inferior courts and which requires the prosecutor's notice of intent to seek the death penalty to be filed within ninety days after arraignment unless good cause is shown, is not coextensive with a defendant's due process right to receive adequate notice of the State's intent to impose the death penalty).

¶36 Turning, then, to the language of Standard I.1.a., the State would have this Court simply read an exception into the 60-day deadline. Relying specifically on *Lee*, *Jackson*, *Shults*, and *Allen*, the District Court adopted the State's suggestion, denying Petitioners' motions on the ground that "the State's failure to file the notice within the time prescribed by the Standard has not prejudiced the Defendant." The court noted that "Defendant was aware of the possible imposition of the death penalty at the inception of this case," that "Defendant has proceeded with the case as if the death penalty were a possible sentence," and that "Defendant [now] has advance notice of the State's intent to seek the death penalty in order for the Defendant to prepare an adequate defense."

¶37 Petitioners respond that "[n]othing in the Standards allow[ed] the district court to entertain whether—upon the State filing a late notice—a defendant has actually been prejudiced or whether the State had good cause for filing an untimely notice." They maintain that "the plain language of the Standards is clear and it [was] not the district court's role to insert analysis of prejudice and good cause" into the rule. In a similar vein, Petitioners explain that they initially proceeded with their cases as if the death penalty was a possible sentence because the cases were, at that point, "potential" capital cases, but once the 60-day deadline passed without the prosecutor's filing his notice of

16

intent to seek the death penalty, they were "entitled to proceed as if their cases were not capital cases." They point out that Standard I.1.a.'s 60-day deadline provides a time-certain date by which a defendant knows whether the case is an actual capital case. They contend, therefore, that the Standards did "not allow for the State to string Petitioners along for 72 days past the deadline, sitting in wait to know whether their cases are capital cases," and that they should not be required "to assume even after a deadline has passed that a potential capital case may still [become an actual capital case]."

¶38 We agree with Petitioners that established rules of statutory construction do not permit the approach advocated by the State and followed by the District Court. In *State v. Kroll*, 2004 MT 203, ¶ 17, 322 Mont. 294, ¶ 17, 95 P.3d 717, ¶ 17, we stated that "[w]here the plain language of the statute is clear and unambiguous, no further interpretation is required." Likewise, in *State ex rel. Palmer v. Hart*, 201 Mont. 526, 530, 655 P.2d 965, 967 (1982), we stated that "[w]here the language of the statute is plain, unambiguous, direct, and certain, the statute speaks for itself." And § 1-2-101, MCA, instructs that "[i]n the construction of a statute, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted." We utilize these same rules when interpreting rules of court. *See Rich v. State Farm Mut. Auto. Ins. Co.*, 2003 MT 51, ¶ 11, 314 Mont. 338, ¶ 11, 66 P.3d 274, ¶ 11; *Busch v. Atkinson*, 278 Mont. 478, 483-84, 925 P.2d 874, 877 (1996).

¶39 Again, Standard I.1.a. states:

In any case in which death is a potential punishment, the prosecutor shall comply with Section 46-1-401, MCA, and shall file with the district court, within 60 days after arraignment, and serve upon counsel of record a notice stating whether the prosecutor intends to seek the death penalty upon a conviction in the case.

By the express terms of this rule, the prosecutor "shall"—as opposed to "may" or "should"—file notice stating whether he or she intends to seek the death penalty upon a conviction within 60 days after the defendant's arraignment. In other words, the notice and timing requirements are mandatory, not discretionary or permissive. *See Redies v. Cosner*, 2002 MT 86, ¶ 19, 309 Mont. 315, ¶ 19, 48 P.3d 697, ¶ 19; *Gaustad v. City of Columbus*, 265 Mont. 379, 381-82, 877 P.2d 470, 471 (1994). Most importantly, nothing in the plain language of the rule suggests that lack of prejudice to the defendant or the defendant's knowledge that the case is a potential death penalty case can supplant the express requirement that the notice be filed within the 60-day time frame.

¶40 It was the District Court's duty, as it is this Court's duty, to construe Standard I.1.a. "as it is written," *Matter of the Estate of Magelssen*, 182 Mont. 372, 378, 597 P.2d 90, 94 (1979), "not to insert what has been omitted," § 1-2-101, MCA. In this regard, Petitioners point out that the version of the Standards adopted by this Court on June 29, 1999, contained a Standard I.1.d., which provided as follows:

If the prosecutor does not indicate a belief that the death penalty may be appropriate in a notice filed within 60 days after arraignment as provided by this standard, but later acquires evidence that, together with any other evidence, leads the prosecutor to conclude that sufficient evidence exists to establish, to the appropriate standard of proof, one or more of the statutory aggravating factors necessary to impose the death penalty upon a conviction in the case, the prosecutor may file the notice provided in this section, only with leave of the district court, *after consideration of the cause for the delay and any prejudice to the defendant*. [Emphasis added.]

18

This Court deleted this exception to the 60-day deadline when we amended the Standards on July 16, 2002—a fact that fortifies Petitioners' argument and our conclusion that the Standards do not contemplate the exception to Standard I.1.a.'s time prescription advocated by the State and read into the Standards by the District Court.

¶41 We hold, therefore, that the District Court erred in concluding that Standard I.1.a.'s 60-day deadline may be ignored if the defendant has not been prejudiced by the prosecutor's failure to abide by it. We now consider the consequences of a prosecutor's failure to file the notice of intent in accordance with the time prescription.

The Consequences of a Prosecutor's Failure to File the Notice of<br>Intent in Accordance with Standard I.1.a.'s 60-day Deadline

¶42 Petitioners argue that failure to comply with Standard I.1.a.'s 60-day deadline "creates a jurisdictional defect precluding the State from seeking the death penalty and imposition of the death penalty as a sentence." They rely on a number of cases, including *State v. Madera*, 206 Mont. 140, 155, 670 P.2d 552, 560 (1983) (characterizing the first persistent-felony-offender notice required by former § 46-18-503, MCA, as "jurisdictional"), *Matter of M.B.*, 282 Mont. 150, 153, 935 P.2d 1129, 1130 (1997) ("[A]n untimely notice of appeal is a jurisdictional defect, which renders this Court powerless to hear the appeal." (internal quotation marks omitted)), *Lemley v. Allen*, 203 Mont. 37, 42-43, 659 P.2d 262, 266 (1983) ("[T]he statute governing costs must be strictly followed, and a failure to serve a memorandum upon the adverse party deprives the district court of jurisdiction in the matter."), and *State v. 1978 LTD II*, 216 Mont. 401, 402-03, 701 P.2d 1365, 1366 (1985) (the defective notice of seizure and intention to institute forfeiture

19

proceedings "deprived the District Court of jurisdiction to enter default judgment"). We disagree with Petitioner's use of the term "jurisdictional" in this context.

¶43 It is important not to confuse categorical time prescriptions with jurisdictional provisions. *See*, *e.g.*, *Kontrick v. Ryan*, 540 U.S. 443, 454, 455, 124 S. Ct. 906, 915 (2004) (observing that courts have been "less than meticulous" in their use of the term "jurisdictional"—e.g., by using the term to describe "emphatic time prescriptions in rules of court"—and that classifying time prescriptions, even rigid ones, under the heading "subject matter jurisdiction" can be "confounding"); *DeShields v. State*, 2006 MT 58, ¶ 10, 331 Mont. 329, ¶ 10, 132 P.3d 540, ¶ 10 (observing that "[j]urisdiction is a word of many, too many, meanings" and that we, along with other courts, sometimes have been "profligate" in our use of the term (internal quotation marks omitted)). Subject-matter jurisdiction, we have explained, "involves the fundamental power and authority of a court to determine and hear an issue." *Stanley v. Lemire*, 2006 MT 304, ¶ 30, 334 Mont. 489, ¶ 30, 148 P.3d 643, ¶ 30. Hence, a provision is properly characterized as "jurisdictional" if it "delineat[es] the classes of cases (subject-matter jurisdiction) . . . falling within a court's adjudicatory authority." *Kontrick*, 540 U.S. at 455, 124 S. Ct. at 915.

¶44 Categorical time prescriptions, by contrast, are "inflexible" or "rigid"—but nonjurisdictional—claim-processing rules. *Kontrick*, 540 U.S. at 454-55, 124 S. Ct. at 915; *Eberhart v. United States*, 546 U.S. 12, 19, 126 S. Ct. 403, 407 (2005) (per curiam). Significantly, whereas subject-matter jurisdiction, because it involves the court's power to hear the case, can never be forfeited or waived, nor can it be conferred by the consent of a party, *In re Marriage of Miller*, 259 Mont. 424, 427, 856 P.2d 1378, 1380 (1993);

20

*Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514, 126 S. Ct. 1235, 1244 (2006), a claim-processing rule, "even if unalterable on a party's application, can nonetheless be forfeited if the party asserting the rule waits too long to raise the point," *Kontrick*, 540 U.S. at 456, 124 S. Ct. at 916.

¶45     Applying these principles in the case at hand, we note that Standard I.1.a. does not speak in jurisdictional terms. It does not purport to delineate a class (i.e., the subject matter) of cases falling within the district courts' adjudicatory authority. More to the point, Standard I.1.a. does not purport to "withdraw" the district courts' jurisdiction over death penalty cases (*see*, *e.g.*, *Rockwell International Corp. v. United States*, 127 S. Ct. 1397, 1405-06 (2007)). Nor could it. The subject-matter jurisdiction of the district courts is established by the Montana Constitution. In particular, Article VII, Section 4(1) provides, in relevant part, that district courts have "original jurisdiction in all criminal cases amounting to felony." Although this Court has the authority, pursuant to Article VII, Section 2(3), to "make rules governing . . . practice and procedure" in the district courts—and Standard I.1.a. is such a rule—this authority does not enable us to withdraw the jurisdiction of the district courts as defined by Article VII, Section 4(1).

¶46     Accordingly, Standard I.1.a. is, necessarily, a categorical time prescription and not a jurisdictional provision. As such, a prosecutor's failure to comply with the 60-day deadline does not create "a jurisdictional defect" precluding the State from seeking the death penalty and precluding the district court from imposing the death penalty as a sentence. Rather, Standard I.1.a. simply "assure[s] relief" to a defendant who properly raises it, but it does not compel the same result if the defendant forfeits it. *Eberhart*, 546

21

U.S. at 19, 126 S. Ct. at 407. Stated differently, Standard I.1.a. is "unalterable" on a defendant's motion but can be forfeited if the defendant "waits too long to raise the point." *Eberhart*, 546 U.S. at 15, 126 S. Ct. at 404 (internal quotation marks omitted).[5]

¶47 In the case at hand, Petitioners unquestionably did not "wait[] too long to raise the point." As noted above, they were arraigned on July 18, 2006, and the prosecutor, therefore, had until September 18, 2006, to file notice stating whether he intended to seek the death penalty upon their convictions. That date passed without such notice being filed; in fact, the prosecutor filed his notice of intent 72 days late, on November 27, 2006. In the meantime, on November 8, 2006, Petitioners filed preemptive motions to preclude the State from seeking the death penalty and to preclude imposition of the death penalty as a sentence. And promptly upon the prosecutor's filing his notice of intent, Petitioners filed objections to and motions to strike the late filing. Under these circumstances, we hold that Petitioners properly and timely raised Standard I.1.a.'s procedural safeguard and that their motions should have been granted.

## CONCLUSION

¶48 The Standards do not contain an exception to Standard I.1.a.'s 60-day deadline, which is a categorical, but nonjurisdictional, time prescription. Thus, where a prosecutor

---

[5] "Forfeiture," as opposed to "waiver," is the correct term in this context, since "forfeiture" refers to "the failure to make the timely assertion of a right," whereas "waiver" concerns "the intentional relinquishment or abandonment of a known right." *Kontrick*, 540 U.S. at 458 n.13, 124 S. Ct. at 917 n.13 (internal quotation marks omitted). As the Ninth Circuit recently noted, however, the result would be no different if the defendant affirmatively waived the time prescription. *See United States v. Sadler*, 480 F.3d 932, 933 n.1 (9th Cir. 2007).

has failed to file notice, stating whether he or she intends to seek the death penalty upon a conviction in the case, in accordance with Standard I.1.a. and the defendant has timely raised this issue in a motion to preclude the State from seeking the death penalty and to preclude imposition of the death penalty as a sentence, that motion must be granted. The District Court erred in deciding to the contrary. Therefore,

¶49 IT IS ORDERED that the Petition for Writ of Supervisory Control is GRANTED.

¶50 IT IS FURTHER ORDERED that the District Court's January 9, 2007 Decision and Order in Cause Number DC 06-213B (Miller) and the District Court's January 9, 2007 Decision and Order in Cause Number DC 06-212B (LeBrum) denying Petitioners' motions to preclude the State from seeking the death penalty and to preclude imposition of the death penalty as a sentence are reversed.

¶51 IT IS FURTHER ORDERED that this case is remanded to the District Court with instructions to grant said motions and for further proceedings consistent with this Opinion and Order.

¶52 IT IS FURTHER ORDERED that the Clerk of this Court give notice of this Opinion and Order to counsel of record and to the Honorable Mike Salvagni, District Judge, presiding.

DATED this 19th day of June, 2007.

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON

23

/S/ W. WILLIAM LEAPHART
/S/ PATRICIA COTTER
/S/ BRIAN MORRIS

Justice Jim Rice dissenting.

¶53 The Petitioners and the Court, in my view, have misapprehended the purpose and function of the 60-day notice provision. It was not necessary for the prosecutor to have given the notice at all, for the entire purpose of the notice had already been fulfilled. Further, changes in constitutional law since adoption of the notice standard have left it with little practical effect.

¶54 To demonstrate the purpose served by the 60-day notice provision, it is necessary to review this Court's adoption of the Standards for Competency of Counsel for Indigent Persons in Death Penalty Cases, of which this rule is a part. The brief filed in support of the Attorney General's original petition to this Court set forth the overall purpose for adoption of Standards:

> A court order establishing competency standards will require district courts to identify and assign adequately trained and experienced lawyers to represent indigent capital clients.

*Brief of the Attorney General in Support of the Petition*, June 23, 1997, p. 8. Thus, the purpose of the Standards was to ensure that district courts would "identify and assign adequately trained and experienced" defense counsel to an indigent defendant charged with a capital crime.

24

¶55    Thereafter, on August 26, 1997, the Court submitted for comment an initial set of proposed Standards for Competency.  In response, it was the State who suggested that a notification provision be added:

> The State suggests that if standards are adopted, the Court should enact a requirement that the prosecutor notify the Court at the earliest reasonable opportunity if the prosecutor intends to treat the case as a potential death penalty case.

*State's Comments on Proposed Standards*, December 23, 1997, p. 7.  What was the purpose of this notice?  As explained by the State, such a notice requirement "is *intended only to provide a trigger* for the application of the other provisions of the standards." *State's Comments*, p. 8 (emphasis added).  "The intent of this requirement is simply to assist the trial court in *identifying the cases* in which the competency standards for counsel must be observed."  *State's Comments*, p. 8 (emphasis added).  Thus, the purpose of the notice was to alert the district court to those cases which would require appointment of counsel who met the capital competency standards.

¶56    On December 30, 1997, the Court, citing the need for "more in-depth study and consideration," appointed a committee to consider the Standards further and to make written findings and recommendations.  The Committee, reporting to the Court on October 29, 1998, recommended that the prosecutor file a notice of intention to seek the death penalty within 60 days after arraignment.[1]  The recommendations were submitted without commentary, but it was not contested by either the Majority or Minority of the

---

[1]The Committee also recommended a provision for late filing of the notice "upon consideration of the cause of the delay and any prejudice to the defendant," discussed hereinafter, which was also adopted by the Court.

25

Committee that "[u]pon receipt of the notice, the court would appoint counsel under the substantive standards for trial level death penalty cases." *Minority Report*, November 2, 1998, p. 2. Thus, the notice provision was still intended to provide a trigger mechanism for appointment by the district court of counsel competent for representation in capital cases. This provision was adopted by the Court on June 29, 1999, which, I would note, was a year prior to the United States Supreme Court's decision in *Apprendi*.

¶57 Therefore, as originally intended and as adopted, and as the plain wording still provides today, Standard I.1.a requires a prosecutor to file a notice of intention to seek the death penalty within 60 days of arraignment. Likewise, Standard I.2 provides that, upon establishment of the defendant's indigency and upon giving of the prosecutor's notice (the "trigger" mechanism), "the district court shall appoint two counsel to represent the defendant." Standard I.3 then provides the standards of competency which the two counsel must meet, and outlines the procedure for submission of information verifying counsel's competency to the district court.

¶58 However, in this case, the Defendants' attorneys and the District Court acted long before the procedure contemplated by the Standards played itself out. As noted by the District Court, the Information alleging the defendants had committed deliberate homicide was filed on July 11, 2006. The Information stated that a possible penalty upon conviction was death. Six days later, on July 17, 2006, Defendant LeBrum's counsel, Al Avignone, submitted information for purposes of demonstrating his possession of the minimum qualifications under the Standards of Competency. The same day, LeBrum's other counsel, John Hud, submitted his information. On July 25, 2006, both of Defendant

26

Miller's counsel, Peter Ohman and Randi Hood, filed their respective Notices of Qualification for purposes of demonstrating their possession of qualifications to satisfy the Standards of Competency.

¶59   On July 24, 2006, the District Court issued an order in LeBrum's case indicating that "although the prosecutor has not filed a notice stating that he intended to seek the death penalty," LeBrum "had been advised" by the Information and other statements that "the death penalty could be imposed upon a conviction," and therefore, the court was moving to appoint defense counsel who qualified under the Standards. *See Decision and Order*, January 9, 2007, p. 3.   After review of the filings of Avignone and Hud, the District Court concluded that both counsel met the Standards of Competency.   On July 27, 2006, the District Court entered a similar order with regard to the appointment of Ohman and Hood for Defendant Miller.

¶60   Thus, the District Court, prompted by the early filings of defense counsel, *sua sponte* "pulled the trigger" of Standard I.1.a by declaring that this was a death penalty case for which the Standards would apply—without further notice by the prosecutor. Then, it proceeded to fulfill Standards I.2 and I.3 by reviewing counsel's qualifications, approving the same, and appointing two attorneys to represent each defendant.   The actions of the District Court thus rendered any further notice by the prosecutor completely moot.

¶61   As the Court correctly notes in its discussion of ¶¶ 38-40, it is this Court's duty to simply declare what the rule contains, nothing more, and to construe Standard I.1.a "as it is written."   *See* ¶ 40.   The Standard provides for nothing more than has already been

27

accomplished. Although the Court holds that the Standard "assure[s] relief" to a defendant who raises it, *see* ¶ 46, the Court does not explain what that relief is—i.e., what more the Standards provided to the Defendants than they already received. The Court cannot explain this because there is simply no further "relief" to be provided under the plain wording of the Standards.

¶62 Defendants' due process arguments are without merit. Jumping in early, and rightfully so, defense counsel's capital case filings prompted the District Court to initiate the process under the Standards without any further notice from the prosecutor. Thus, all of the process under the Standards to which the Defendants were entitled was provided to them. Though probably filed as a panic reaction to the Defendants' assertions that a deadline was missed, the prosecutor's notice filing was moot and redundant, as the process it was designed to engender had already been completed.

¶63 It is not necessary to reach the issue of whether there is an "exception" to the notice rule, nor is it necessary to reach the issue of whether the Defendants were prejudiced. Of course, they were not prejudiced, because they received from the District Court everything the Standards required them to receive.

¶64 Finally, and perhaps most importantly, I offer a note about the 2002 amendment to Standard I.1.a, about which much has been made in the Petitioners' arguments, and the current status of the 60-day rule. The Court's 2002 amendment to the Standard deleted the provision for filing of a notice of intention to seek the death penalty after expiration of the 60-day period. As the amending order stated, the amendment was made in response to the Legislature's 2001 adoption of § 46-1-401, MCA, which required

28

aggravating factors statutorily authorizing imposition of the death penalty to be alleged in the Information. Thus, a "late" filing of a notice of intention to seek the death penalty was no longer possible, as the crime would be designated a capital one at the time of the Information's filing, a fallout of the United States Supreme Court's *Apprendi* decision in 2000. That is exactly what happened here—the case was designated a capital one at the time of the Information's filing—which illustrates that the 60-day notice provision may hold little practical significance in the post-*Apprendi* world. With the enactment of § 46-1-401, MCA, the filing of an Information which alleges aggravating factors becomes the practical "trigger" for a district court's appointment of capital-qualified counsel. Indeed, it should be so, because capital-qualified counsel should be in place as early as possible. If the Information does not allege such factors, a prosecutor's notice, timely or not, cannot turn the case into a capital one. However, a filing of an amended Information in the case which alleges aggravating factors would do so, even if filed more than 60 days later. Consequently, the Standards for Competency remain valid, but the practical effect of the mechanism for triggering the appointment of qualified counsel has been altered by subsequent court decision and statutory enactment.

¶65 I would not disturb the District Court's orders.

/S/ JIM RICE

Justice John Warner joins the dissent of Justice Rice.

/S/ JOHN WARNER